2022 IL App (4th) 200314

NO. 4-20-0314

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 7, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Adams County |
| STEVEN GAVIN, | ) | No. 17CF352. |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert K. Adrian, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.

Justices Turner and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Steven Gavin, was found guilty of first degree murder and armed robbery and sentenced to 85 years' imprisonment. Defendant appeals, arguing the trial court committed reversible error when it (1) allowed the jury to receive testimony about a witness's ability to identify defendant's voice, (2) allowed the jury to receive testimony about defendant's refusals to comply with a court order to provide a deoxyribonucleic acid (DNA) sample, (3) allowed the jury to receive testimony about the absence of forensic testing by the defense, (4) precluded the jury from receiving testimony from a defense witness, (5) allowed the jury to view defendant's "booking photo" during closing argument, and (6) imposed the maximum sentence. For the reasons that follow, we conclude defendant has not shown the trial court's decisions related to the evidence presented at his trial or the sentence imposed against him amount

to reversible error. Therefore, we affirm the trial court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3                              A. Charges and First Trial

¶ 4        In May 2017, the State charged defendant with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2014)) and one count of armed robbery (*id.* § 18-2(a)). The State alleged on November 23, 2015, defendant, while armed with a firearm, took United States currency from Carlous Wires Sr. (Carlous Sr.) and shot Carlous Sr. in the head, causing his death. The case proceeded to a jury trial in February 2019. Because the jury was unable to reach a verdict, a mistrial was declared, and the case was set for retrial.

¶ 5                                B. Motion to Suppress

¶ 6        In March 2019, defendant filed a motion to suppress voice lineup identifications. At a hearing that same month, defendant, over no objection, invited the trial court to consider his motion in light of the testimony presented at his first trial, as well the undisputed factual allegations from prior hearings related to the identifications.

¶ 7        As gleaned from the testimony and the undisputed factual allegations, on the evening of November 23, 2015, Shelby Wires allowed her father, Carlous Sr., to use her cell phone to make a phone call. She overheard her father ask if "Steve was there" during the call. Her father then ended the call and returned the cell phone to her. Moments later, Shelby received an incoming call from a phone number she did not recognize. Shelby answered the call and heard an apparent male voice ask, "Did somebody call for Steve?" Shelby spoke with her father, who then took her phone from her and had a conversation with someone on the phone. Shelby overheard her father tell the person "to come by and see him." Shortly thereafter, Carlous Sr. was found dead, and Shelby informed police of the calls. Shelby was asked by the lead detective on the case, Adam

Gibson, if she recognized the voice she heard on the call. Shelby indicated she did not. Shelby testified she had not heard the voice from the phone call prior to receiving the call on the evening her father was killed.

¶ 8        During preparations for defendant's first trial, Shelby was asked by the prosecution if she believed she could identify the voice she heard on the phone call. Shelby believed she could. The prosecution asked the lead detective to meet with Shelby to conduct a voice lineup. The detective met with Shelby and played four clips of recordings of jailhouse phone calls. Each clip was approximately 30 seconds long and contained no names. The detective indicated some of the clips were played more than once. Shelby estimated the clips were played two or three times. (We note the recordings are not part of the record on appeal.)

¶ 9        The first clip played for Shelby contained the voices of defendant and a woman named Alanna Dawson. It did not contain any reference to a relationship between the speakers. The detective testified Shelby "almost instant[aneously]" identified the male voice she heard on the clip as the voice she heard on the phone call years earlier. Shelby also indicated she recognized the female voice as belonging to Dawson. Shelby explained she knew Dawson, having been in each other's homes and having been "friends with her daughters when we were kids." Upon being asked by the defense if she was aware Dawson "was friends or maybe even boyfriend/girlfriend" with defendant, Shelby testified, "I have heard that." Shelby testified she did not identify the male voice based upon her ability to recognize the female voice.

¶ 10        After playing the first clip, the detective played the three other clips. Before doing so, the detective testified he told Shelby "all the voices would be different." The second and third clips did not contain defendant's voice. The detective testified Shelby "immediately said no, it was not the voice," upon him playing the second clip. Shelby also indicated the voice on the third clip

was not the voice she heard on the phone call years earlier. The fourth clip, despite the detective telling Shelby all the voices on the clips would be different, contained the voice of defendant. Shelby identified the voice on the fourth clip as the voice she heard on the phone call.

¶ 11　　　　Shelby, when asked if she remembered the voice from the phone call she received years earlier, testified, "Yes, I do very well." She explained, "It's just a reoccurring nightmare for me. It has been a nightmare. You know, when I close my eyes, I just hear that voice." Shelby believed she could recognize the voice if she heard it again. Defendant, in open court during the first trial, stated, "Is anyone calling for a Steve." Shelby identified defendant's voice as the voice she heard on the phone call years earlier. Shelby testified she had no doubt the voices she heard in court and in the clips were the same voice she heard on the phone call.

¶ 12　　　　Based upon these facts, defendant argued, in relevant part, the voice lineup identifications should be suppressed because the lineup procedure used by the police was improper and the resulting identifications were not reliable. Defendant's counsel, when arguing the lineup procedure used by the police was improper, noted he "was surprised" to notice there was not "some procedure set up by the [s]upreme [c]ourt or somebody" as it related to voice lineups. After hearing from the State, the trial court denied defendant's motion. In reaching its decision, the court specifically found the procedure used by the police was "sufficient" to make the identifications admissible, and defendant's concerns with the lineup procedure went to the weight that should be accorded to the identifications.

¶ 13　　　　　　　　　　　　C. Second Jury Trial

¶ 14　　　　In January 2020, the trial court conducted a second jury trial. The following is gleaned from the evidence presented.

¶ 15　　　　In November 2015, Carlous Sr. lived with his wife, Vivian Wires, and adult

daughter, Shelby, in a two-story house in Quincy, Illinois. Carlous Sr. and Vivian had been married for about 30 years and had two other adult children, Carlous Wires Jr. (Carlous Jr.) and Raphael Wires. According to Vivian, Carlous Sr. had his "demons," including crack cocaine, marijuana, and alcohol. Vivian suspected Carlous Sr. sold marijuana.

¶ 16    On the evening of Monday, November 23, 2015, Carlous Sr. was at his house with Vivian. According to Vivian, she and Carlous Sr. were having "one of those spits or spats" typical of their 30-year marriage. She was upset with him because he made "a pass at someone" the day before. As a result, Vivian spent most of the evening in an upstairs bedroom. At some point, Carlous Sr. went upstairs and acknowledged Vivian was upset with him and offered to take her shopping after Thanksgiving. He then "threw" some money at her, which she picked up and threw in a trashcan because she was still upset. Vivian followed Carlous Sr. downstairs and noticed he had a bottle of whisky and a gallon-sized bag of marijuana. Vivian picked up the bottle of whisky and said to Carlous Sr., "is this what it's gonna be about tonight?" She also told him to get the marijuana out of her house. She then returned upstairs and went to sleep.

¶ 17    Later, Vivian woke up and heard the door to the house "forcefully open," followed by "heavy footsteps" and "two gunshots." At that point, Vivian believed Carlous Sr. was outside shooting a BB gun at the cats that had been messing with their garbage. Vivian got out of bed. Upon reaching the stairs, Vivian smelled an odor as if "you shot off a cap gun" and saw smoke in the air. After going down the stairs, she noticed the door to their house was open. She went outside and called aloud for Carlous Sr. Hearing no response, Vivian returned to the house, at which point she saw Carlous Sr. laying on the floor with blood coming from his head. At that point, Vivian suspected Carlous Sr. had committed suicide. She, "in shock," called 911 and reported her suspicions. While on the phone with the 911 operator, Vivian noticed the bag of marijuana.

Because she was scared, she picked up the bag and threw it outside. Vivian reported to police that her husband had shot himself. When asked for the location of the firearm, Vivian suggested it might be under Carlous Sr.'s body. After no firearm was discovered near Carlous Sr., an investigation commenced into Carlous Sr.'s death. Vivian testified she had nothing to do with her husband's death.

¶ 18    A forensic pathologist testified Carlous Sr. sustained two gunshot wounds to his head, which caused his death. The pathologist opined it was not possible for Carlous Sr. to have shot himself twice, as either wound would have caused instantaneous unconsciousness. Carlous Sr. had money in his hand at the time of his death. There was no evidence of a forced entry into the house. Except for a BB gun, no firearm was found inside or outside the house. In the living room, there were two upright cartridge casings, a cardboard box containing loose cannabis, two small baggies of a substance containing cocaine, and a bottle of whiskey. In an upstairs bedroom, money was found inside a trash can. The money in the trash can was not collected or tested. No gallon-sized bag of marijuana was ever recovered.

¶ 19    Vivian was interviewed by the lead detective, Gibson, and agreed to submit to a gunshot residue test. A gunshot residue test was also administered to Carlous Sr. The right hand of Vivian tested positive for gunshot residue, and the right and left hands of Carlous Sr. tested positive for gunshot residue. These results, according to a forensic scientist, indicate Vivian and Carlous Sr. either fired a firearm, were in the presence of a gunshot residue environment, or came in contact with an object that had gunshot residue. Vivian used the bathroom and washed her hands prior to having the gunshot residue test administered.

¶ 20    The lead detective acknowledged Vivian's being the only other person in the house at the time of Carlous Sr.'s death and her having gunshot residue on her hand initially made her a

strong suspect. The detective explained that his continued investigation into Vivian and the other suspects, as well as his discussion with the forensic scientist about gunshot residue, ultimately led the investigation away from Vivian.

¶ 21    Vivian was asked on cross-examination about calling a woman named Amy Garland Simmons shortly after Carlous Sr.'s death. Vivian believed she "accidentally called her" when trying to call her son. Vivian was asked if she stated to Simmons: "[O]h, my God, they're in my house. They killed my husband." Vivian testified she did not remember making that statement. Vivian also was asked on cross-examination about the information she disclosed during prior interviews. Vivian acknowledged she did not initially disclose certain information, including information about the bottle of whiskey and bag of marijuana. Vivian did not recall what she disclosed about the money in the trashcan during the first interview. Evidence was later introduced, showing Vivian initially stated Carlous Sr. had put the money in the trashcan but then, after a break during the interview, admitted she threw the money in the trashcan during their spat.

¶ 22    Shelby testified she was present in her parent's home for part the evening on November 23, 2015. She cooked dinner for her parents around 8:30 p.m. and then went to a gas station to purchase whiskey for her father. Later that evening, Carlous Sr. asked Shelby to use her cell phone and then made a call and asked for "Steve." Carlous Sr. then gave the phone back to Shelby. Moments later, Shelby received a call from a phone number she did not recognize. Upon answering the phone, Shelby heard a male voice ask, "[d]id somebody call lookin' for Steve?" Shelby did not recognize the voice. Shelby gave her phone to her father, who had a conversation with someone on the phone. She heard her father tell the person to come see him. Shelby waited for her father to be done with the call and then took her phone and left for the evening. Phone records established an outgoing call to 660-221-*** was placed on Shelby's phone at 10:24 p.m.

and an incoming call from 217-257-*** was received on her phone at 10:27 p.m. Around 11:50 p.m., Shelby received a call from her mother telling her that her father "had been murdered" and to return home. Shelby returned home. When speaking with police, Shelby began thinking about the phone calls from earlier that evening. She told the police about her father using her cell phone and receiving a call from someone named "Steve."

¶ 23　　　　Over defendant's continued objection, Shelby, as well as the lead detective, was asked about the voice lineup that occurred shortly before defendant's first trial. The jury heard about the circumstances of the voice lineup and Shelby's ability to identify defendant's voice as the voice she heard during the phone call on November 23, 2015. On cross-examination, Shelby indicated she did not recall recognizing a female voice during the voice lineup as belonging to Dawson. She was later impeached on the issue. Shelby testified she had no doubt the voices she heard during the lineup were the same voice she heard years earlier during the phone call.

¶ 24　　　　In addition, Shelby, over defendant's objection, was asked to listen to defendant make the following statement in court: "Did someone call for Steve?" Shelby identified the voice of defendant as the voice from the phone call from years earlier. Shelby testified she had no doubt the voice she heard in court was the same voice she heard during the phone call. She testified she could never forget the voice. She explained: "It's a recurring nightmare, you know. Just to, you know, have that feeling, that that could have been the last person to talk, see or even be with my father, you will never forget that. It's like a nightmare."

¶ 25　　　　Shelby acknowledged having a 2012 misdemeanor theft conviction and being on probation for possession of methamphetamine at the time of her testimony. During an interview shortly after Carlous Sr.'s death, the lead detective noticed a red substance on Shelby's shoe. Shelby reported it was smashed tomatoes. Upon inspecting the shoe further, the detective saw what

appeared to be smashed tomatoes and, therefore, did not conduct further testing of the substance.

¶ 26 Dawson testified in November 2015, she was driving to Springfield, Illinois, when she received a phone call from someone asking for her friend, Steven, who she identified as defendant. She then called defendant and gave him the caller's phone number. Dawson initially testified she received the call on a Monday but then later testified she received the call on a Friday. She believed it was raining when she received the call. Weather reports for Quincy and Springfield showed there was light rain on Friday and no rain on Monday. Dawson testified she had a 660-221 cell phone number in 2015; she could not remember the last four digits of the number.

¶ 27 Cell phone tower records showed, at 11:32 p.m. on November 23, 2015, a call was made from the 217-257-*** number. The call used a cell tower located within blocks of Carlous Sr.'s house, indicating the phone would have been located within the cell footprint of that tower.

¶ 28 Michael Gay testified he was walking by Carlous Sr.'s house around 11:30 p.m. on November 23, 2015, and noticed a red "older model vehicle" parked in front of the house. He then saw a black male leave the house, retrieve something from the car, and return to the house. Gay acknowledged having, at that time, a warrant out for his arrest and an addiction to methamphetamine. About a week later, Gay met with police, after being arrested on an unrelated warrant. Gay acknowledged he had been "riding around" looking for the vehicle he observed and communicating with Carlous Jr. prior to the meeting. Gay testified he and Carlous Jr. discussed "a way that I could give them the information I knew without being arrested on my warrant." Evidence was later introduced showing Gay had previously stated he talked with Carlous Jr. to get his timeline correct. Gay testified he spoke with police because he wanted to be present at an upcoming event for his children and because he wanted to discredit the suggestion that he was involved in Carlous Sr.'s death. With respect to the latter, Gay had heard Rafael and three other

guys planned to "jump" him for his alleged involvement. Gay agreed to provide a DNA sample and have his cell phone searched. Gay identified the vehicle he observed to police. The vehicle Gay identified belonged to defendant's mother. On cross-examination, Gay acknowledged he described the person he observed outside Carlous Sr.'s house as being between 5'6'' and 5'10'' and wearing a stocking cap. While Gay could not recall if he previously estimated the age of the person, evidence was later introduced showing he described the person as being between 30 and 40 years old. Also on cross-examination, Gay acknowledged telling police during a September 2017 interview about seeing two people outside Carlous Sr.'s house. Gay described the second person during that interview as being between 5'7'' and 5'8''. Defendant, as later acknowledged by the lead detective, was approximately 6'0". Gay acknowledged he had 2016 convictions for theft and possession of methamphetamine and a 2017 conviction for theft.

¶ 29        David Scott testified he was near Carlous Sr.'s house around 11:30 p.m. on November 23, 2015, and heard "one or two" gunshots. He then saw defendant drive by from 10 to 20 feet away in the vehicle identified by Gay. The vehicle was driving below the speed limit. Scott acknowledged he had been drinking alcohol earlier that night. He was impeached with statements as to the amount of alcohol he had consumed. Scott maintained he was not intoxicated at the time he heard the gunshots and saw the driver. Scott, despite talking with police on the night of Carlous Sr.'s death, did not share his observations at that time. He spoke with Carlous Jr. before disclosing to police what he had observed.

¶ 30        Robert McPhail, who at the time of testifying was imprisoned, testified he received a phone call from his friend, defendant, just after midnight on November 24, 2015. Cell phone tower records show the 217-257-*** number was in communication with the cell tower closest to McPhail's residence around 1 a.m. McPhail testified defendant asked to be picked up at an unusual

place, where McPhail had never previously picked defendant up. McPhail did so and the two of them returned to McPhail's trailer, which he shared with Terron Cartmill. Upon their arrival, defendant asked McPhail for a change of clothes and shoes, a request which defendant had never previously made. Defendant placed his old clothes and shoes in a bag and asked McPhail to throw them away. McPhail complied, and the trash was picked up the next day. McPhail testified defendant had a "large amount of money," which was unusual for him. Defendant gave McPhail a $20 bill for cigarettes and iced tea. While standing in line at a gas station, McPhail noticed fresh blood on the bill. McPhail returned to the trailer and noticed defendant and Cartmill were talking. McPhail testified he had previously seen defendant drive the vehicle identified by Gay. Evidence was later presented, showing McPhail had not previously told police about defendant requesting shoes and discarding his own. Evidence was also introduced, showing McPhail made statements indicating defendant was wearing a white t-shirt, light blue jeans, and white tennis shoes. McPhail acknowledged being addicted to and using heroin on November 23, 2015. He also acknowledged having 2013 convictions for misleading a public official and theft, a 2016 conviction for theft, and 2018 convictions for residential burglary and aggravated battery.

¶ 31        Cartmill testified McPhail left their trailer to pick up defendant. At the time, Cartmill had known defendant for about six months. When McPhail returned to the trailer with defendant, defendant requested a change of clothes and then placed his clothes in a bag and threw the bag in the trash. Cartmill testified defendant had a "nice-size wad of money," which he noted was unusual for him. Cartmill also noticed blood on the money. Cartmill testified defendant gave McPhail money to go to the gas station to buy cigarettes. When McPhail left, defendant and Cartmill had a conversation about where defendant got the money. McPhail testified defendant told him that he went to Carlous Sr.'s house to sell crack cocaine and got in a dispute with Carlous

Sr. because Carlous Sr. wanted to pay only $80 instead of $100. Carlous Sr. told defendant there would be more where that came from, before showing defendant the wad of money. Defendant got upset, left the house, and retrieved a gun. When he returned to the house with the gun, he demanded the cash, before shooting Carlous Sr. twice in the head and taking the money from his hands. Cartmill testified defendant left the trailer later that morning while it was still dark outside. Cartmill acknowledged using heroin and having a warrant out for his arrest on the night in question and having a 2012 conviction for possession of a controlled substance and a 2016 conviction for possession with the intent to distribute cocaine. Cartmill acknowledged previously having told police he had no knowledge about the murder, explaining he did so to avoid repercussions from "the street." Cartmill testified he decided to testify "[t]o give the family the closure they deserve." Evidence was introduced showing Cartmill previously stated defendant told him that he had "gotten into it with a white guy down the street over a drug deal." Cartmill also previously described defendant as wearing a black hooded sweatshirt, black pants, and black shoes with blood on them.

¶ 32        Vicky Shumpert testified around 4 a.m. on November 24, 2015, she woke up and heard talking in the apartment above her apartment, where defendant's sister lived. Shumpert eventually went upstairs and saw defendant. She was familiar with defendant and had spoken with him enough to recognize his voice. She overheard defendant say, "mother f*** saying, I took some bloody money to the gas station." Shumpert acknowledged she was friends with Vivian.

¶ 33        Helen Horton testified defendant gave her money to buy drugs not long after Carlous Sr.'s death. Horton noticed blood on the money. Then, a couple months later, she overheard defendant, while they were both using drugs, repeatedly saying, "it wasn't supposed to happen like that." When Horton asked what he was talking about, defendant admitted to robbing

and killing Carlous Sr. The next day, defendant went to Horton's apartment and threatened to kill her mother if she said anything. Horton acknowledged being addicted to methamphetamine and having a 2007 conviction for distribution of a look-alike substance, 2010 convictions for violating a registration act and escape, a 2013 conviction for retail theft, and 2017 convictions for possession of a controlled substance. In addition, Horton acknowledged she had recent convictions for possession of a controlled substance and theft. Horton acknowledged telling police in February 2017 she had no information about Carlous Sr.'s death. She also acknowledged she did not tell a grand jury in May 2017 about the bloody money. She eventually disclosed to police the information of which she was aware after inquiring if there were any charges against her and calling her mother to make sure she would be safe. Horton is related to Shumpert.

¶ 34        Annette Gavin, defendant's mother, testified defendant was living with her in November 2015. On November 23, 2015, defendant drove her home and then gave her the keys to her vehicle. She placed the keys in her purse and then placed her purse in her bedroom before going to sleep that night. Both when she went to sleep and when woke up the next day, her vehicle was outside her home, and her keys were in her purse. Annette was asked about a search of defendant's bedroom conducted by police. Annette testified the 13 cell phones and sim cards found in defendant's bedroom belonged to her and not defendant. Of the phones that could be accessed, none used the 217-257-*** number.

¶ 35        Carlous Jr. testified he had no contact with Gay between November 23 and December 2, 2015. Carlous Jr. acknowledged he had been in contact with Scott.

¶ 36        Raphael testified he had spoken with Gay between November 23 and December 2, 2015, about Gay's observations of a vehicle outside his father's house.

¶ 37        Altheia Buckner testified that she spoke with Horton, in April or May 2019, while

they were incarcerated. Buckner testified Horton stated the lead detective assigned to this case sold drugs and told her what to say in multiple murder trials, including the one involving Carlous Sr. Buckner disclosed this information to the prosecution and, after doing so, asked, " 'What do I get? I want to get out of jail.' " Buckner acknowledged having a 2004 conviction for forgery; 2012 convictions for possession of methamphetamine, misdemeanor theft, and "crack cocaine"; and 2019 convictions for forgery, possession of methamphetamine, and retail theft.

¶ 38       Almost three weeks after defendant's arrest on charges in this case, the prosecution obtained a court order requiring defendant to submit a DNA sample for testing. During the trial, the State indicated it intended to elicit testimony about defendant's initial refusals to submit a sample. The defense objected, arguing, in part, such testimony would be "highly prejudicial." The court, after balancing the probative value and prejudicial impact, allowed the State to inquire about the refusals. The State elicited testimony from two different witnesses about defendant's refusals to submit a DNA sample for testing after being informed of a court order to do so. Defendant eventually submitted a DNA sample.

¶ 39       During the cross-examination of a crime scene technician, the defense asked if the cartridge casings were tested for fingerprints. The technician indicated, at the direction of the State, they were not tested. On redirect-examination, the State asked if the defense had asked for the cartridge casings to be tested for fingerprints. The defense objected, arguing the inquiry by the State suggested it was the defendant's responsibility to present evidence. The State disagreed, contending it was a proper inquiry in response to the defense's cross-examination. The court agreed with the State and overruled the objection. The technician testified the defense had not requested the cartridge casings be tested.

¶ 40       The lead detective acknowledged information about the investigation into Carlous

Sr.'s death had been released to the public through the media. The detective testified the media was never informed about a drug deal involving cocaine or bloody money. The detective also acknowledged keeping Carlous Sr.'s family updated on the investigation.

¶ 41    Outside the presence of the jury, the State raised an issue with the defense calling Simmons. The State indicated it believed the defense intended to use Simmons to impeach Vivian with the statement she did not remember making during their phone call. The State acknowledged Simmons had previously made a statement to a police officer about Vivian's statement. However, the State asserted, Simmons had recently told the State that she did not remember Vivian's statement. Under these circumstances, the State suggested the defense should first call Simmons outside the presence of the jury to determine if she remembered Vivian's statement. The State argued, in the event Simmons testified she did not remember Vivian's statement, it would be improper for the defense to impeach Simmons to impeach Vivian. The defense, in response, agreed it intended to use Simmons to impeach Vivian. Defense counsel stated he thought from the conversations he had with Simmons that "she remembered at least part of that as far as what happened" and "has reviewed the police report." At that point, the State objected, arguing it was improper for the defense to allow Simmons to review the police report. In response, defense counsel explained Simmons had indicated she sustained some sort of injury, causing memory problems, and asked him to share with her what she had previously told the police, which counsel did. Counsel did not recall whether he specifically showed Simmons the report or read it to her. The trial court sustained the State's objection and barred Simmons' testimony, finding the testimony was "tainted" by being provided with the information from the police report.

¶ 42    No evidence was introduced linking defendant's fingerprints or DNA to Carlous Sr.'s death.

¶ 43       During closing arguments, the State used a photograph of defendant that was not entered into evidence or presented as a demonstrative exhibit earlier in the trial. Defendant objected, arguing the "photo has never been entered into evidence in this case." The trial court overruled defendant's objection.

¶ 44       Based upon the evidence presented, the jury found defendant guilty of first degree murder and armed robbery.

¶ 45                     D. Posttrial Proceedings

¶ 46       In April 2020, defendant filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, complaining about various decisions of the trial court related to the evidence presented at his trial. Following a hearing, the court denied defendant's motion.

¶ 47       In May 2020, the trial court conducted a sentencing hearing. The court received a presentence investigation report and a victim impact statement. No other evidence was presented. The State recommended defendant be sentenced to 60 years' imprisonment, while the defense recommended defendant be sentenced to 45 years' imprisonment. Defendant declined to give a statement in allocution. In the oral pronouncement of its decision, the court indicated it considered the evidence and recommendations presented, as well as "all the factors in aggravation and mitigation." The court explained it considered the factors in aggravation and mitigation "set out in the law." The court stated, "There are many aggravating factor which the [c]ourt has found." The court noted this appeared to be the first case in which it could not "find a single factor in mitigation for the defendant." The court then reviewed, on the record, the factors in mitigation "to make sure that none of those apply." The court found "there are no mitigating factors in this case." The court sentenced defendant to 85 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court denied after a hearing.

¶ 48        This appeal followed.

¶ 49                                II. ANALYSIS

¶ 50        On appeal, defendant complains about various decisions of the trial court related to the evidence presented at his trial and the sentence imposed against him. The State, in response, contends defendant has not shown any of the court's decisions amount to reversible error. We address each of the complained-of decisions in turn.

¶ 51                            A. Voice Identifications

¶ 52        Defendant argues the trial court committed reversible error when it allowed the jury to receive the testimony about Shelby's ability to identify his voice. Specifically, defendant asserts (1) his motion to suppress the voice lineup identifications should have been granted because those identifications were the product of an unnecessarily suggestive procedure used by the police and not independently reliable and (2) his objection to the in-court identification should have been sustained because that identification was tainted by the improper voice lineup identifications. Defendant further asserts the court's error in allowing the jury to receive the testimony about Shelby's ability to identify his voice was not harmless.

¶ 53        Identification by voice may be used to establish guilt of an accused. *People v. Johnson*, 114 Ill. 2d 170, 190, 499 N.E.2d 1355, 1363-64 (1986). Ordinarily, the weight to be given to a voice identification, like most factual determinations, is a question for the finder of fact to resolve. *Id.* However, relevant here, a voice identification should be excluded under the due process clause of the fourteenth amendment where it is (1) the product of an unnecessarily suggestive lineup procedure used by the police and (2) not independently reliable. *People v. Williams*, 313 Ill. App. 3d 849, 859, 730 N.E.2d 561, 570 (2000); see also *Perry v. New Hampshire*,

565 U.S. 228, 238-39 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.").

¶ 54    Where a defendant claims a voice lineup identification should be suppressed on due process grounds, the defendant bears the initial burden of proving the procedure used by the police was unnecessarily suggestive. *Williams*, 313 Ill. App. 3d at 859; see also *Perry*, 565 U.S. at 241 ("A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances *** is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place."). If the defendant meets this initial burden, the State must then show the identification, made under suggestive circumstances, is reliable. *Williams*, 313 Ill. App. 3d at 859. On review from a motion to suppress, this court will generally uphold a trial court's factual findings unless they are against the manifest weight of the evidence but review *de novo* the ultimate legal conclusion as to whether suppression is warranted. See *People v. Gaytan*, 2015 IL 116223, ¶ 18, 32 N.E.3d 641.

¶ 55    In this case, we agree with the trial court's assessment that defendant did not prove the identifications were the product of an unnecessarily suggestive lineup procedure used by the police. At the outset, defendant contends the requirement that he show the identifications were the product of an unnecessarily suggestive procedure used by the police does not, as a matter of law, require a showing of police misconduct. The United States Supreme Court, however, has rejected defendant's contention in the context of eyewitness identifications: "The due process check for reliability *** comes into play only after the defendant establishes improper police conduct." *Perry*, 565 U.S. at 241. The Supreme Court concluded: "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.*

at 245; see also *In re T.B.*, 2020 IL App (1st) 191041, ¶ 38, 148 N.E.3d 251 ("the remedy of suppression drops out of the picture, because the defendant is not alleging police misconduct"). Accordingly, we reject defendant's contention.

¶ 56        As to the circumstances of the lineup, defendant, in support of his argument that the identifications were the product of an unnecessarily suggestive procedure used by the police, relies heavily on the fact Shelby identified the voice of a woman with whom she was familiar and knew to possibly be defendant's girlfriend in the first clip. As the State asserts, Shelby's knowledge does not, by itself, support defendant's argument. Instead, we must also know whether the detective who arranged the lineup knew, or should have known, of Shelby's knowledge prior to conducting the lineup. Defendant has never suggested the detective had, or should have had, such knowledge.

¶ 57        Defendant also relies on the fact the lineup did not occur until almost three years after Shelby first heard the voice. There is, however, no evidence to suggest the delay in conducting the lineup was a decision by the police; in fact, the evidence showed it was Shelby who did not disclose her belief that she could identify the voice until shortly before defendant's first trial. In addition, defendant relies on the fact that the lineup used a second clip of his voice. Defendant does not, however, cite any authority suggesting that doing so renders the procedure used by the police unnecessarily suggestive. Moreover, the detective's instruction that "all the voices would be different" after Shelby identified defendant's voice in the first clip mitigated any suggestiveness caused by including defendant's voice twice. Last, defendant relies upon the detective's failure to follow statutory procedures applicable to eyewitness lineups. The failure to follow an inapplicable statute does not, however, render the procedure used by the police unnecessarily suggestive.

¶ 58 Ultimately, defendant's concerns with the lineup procedure used by the police went, as the trial court found, to the weight to be accorded to the identifications. Indeed, defendant, through cross-examination, highlighted the circumstances of the lineup and then, during closing argument, asserted the jury should discount the voice identifications. Finally, because defendant did not prove the lineup identifications were the product of an unnecessarily suggestive procedure used by the police, his assertion before this court that his objection to the in-court identification should have been sustained because it was tainted by the improper voice lineup identifications also must fail.

¶ 59 Our legislature has set forth detailed statutory procedures applicable to eyewitness lineups. See 725 ILCS 5/107A-2 (West 2018). It has not done the same for voice lineups. While voice lineups may not be used as often as eyewitness lineups, an argument, as evidenced by this case, still exists in favor of legislation setting forth procedures applicable to voice lineups.

¶ 60                          B. Refusals to Provide a DNA Sample

¶ 61 Defendant argues the trial court committed reversible error when it allowed the jury to receive the testimony about his refusals to comply with a court order to provide a DNA sample. Specifically, defendant asserts his objection to the testimony about his refusals should have been sustained because the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. Defendant further asserts the court's error in allowing the jury to receive the testimony about his refusals was not harmless.

¶ 62 Evidence is generally admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence will be deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence "may be excluded if

its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). "A trial court's balancing of probative value and prejudicial impact is reviewed for an abuse of discretion." *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 79, 128 N.E.3d 1178.

¶ 63 In this case, defendant, in his opening brief, acknowledges that the testimony about his refusals to comply with a court order to provide a DNA sample has some tendency to indicate a consciousness of guilt; therefore, it is relevant and generally admissible. See *People v. Edwards*, 241 Ill. App. 3d 839, 843, 609 N.E.2d 962, 966 (1993); *People v. Roberts*, 115 Ill. App. 3d 384, 387, 450 N.E.2d 451, 453 (1983). Defendant contends the trial court's decision to allow such testimony amounts to an abuse of discretion because its probative value was substantially outweighed by its prejudicial effect, given the State's overemphasis of the testimony at trial and the absence of DNA evidence establishing his guilt. Defendant's contention is unconvincing. First, we reject defendant's suggestion that the State overemphasized defendant's refusals by simply eliciting testimony about those refusals and other witnesses' voluntary submission to testing and then addressing defendant's refusals in closing argument. We also reject defendant's suggestion that the absence of DNA evidence establishing his guilt made his refusals unfairly prejudicial. *People v. Ealy*, 2015 IL App (2d) 131106, ¶ 51, 53 N.E.3d 109, a case upon which defendant relies, is factually distinguishable in that the defendant in that case refused to submit a DNA sample as an exercise of his constitutional right to be free from unreasonable searches and seizures; the defendant did not refuse to submit a DNA sample when faced with an undisputed valid court order.

¶ 64 Defendant also, for the first time in his reply brief, highlights the circumstances of his refusals and argues, given those circumstances, the testimony about his refusals should have been excluded due to its dubious probative value. Because defendant did not raise this argument in his opening brief, it is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not

argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Forfeiture aside, defendant's argument is unconvincing. The record shows defendant was first ordered to submit a DNA sample more than three weeks after he was arrested and while he was represented by counsel. *People v. Townes*, 130 Ill. App. 3d 844, 858-59, 474 N.E.2d 1334, 1344 (1985), a case upon which defendant relies, is factually distinguishable in that the defendant in that case refused to submit samples required by a search warrant on the day the defendant was arrested and served with the warrant and then submitted samples two days later, after being appointed counsel.

¶ 65                    C. Absence of Testing by the Defense

¶ 66        Defendant argues the trial court committed reversible error when it allowed the jury to receive the testimony about the absence of any fingerprint testing to the cartridge casings by the defense. Specifically, defendant asserts his objection to the State's inquiry concerning whether the defense had asked for the cartridge casings to be tested for fingerprints should have been sustained because it improperly shifted the burden of proof. Defendant further asserts the court's error in allowing the jury to receive the testimony about the absence of testing was not harmless.

¶ 67        "[A] criminal defendant has no duty to produce evidence at trial, and the State may never shift its burden of proof to a defendant." *People v. Mudd*, 2022 IL 126830, ¶ 34. "While the prosecution is generally not permitted to comment on a defendant's failure to produce evidence, such comments are not improper after a defendant with equal access to that evidence assails the prosecution's failure to produce it." *People v. Jackson*, 399 Ill. App. 3d 314, 319, 926 N.E.2d 786, 791 (2010). A trial court's determination that a particular inquiry is a proper subject of examination is generally reviewed for an abuse of discretion. *People v. Terrell*, 185 Ill. 2d 467, 498, 708 N.E.2d 309, 325 (1998).

¶ 68 In this case, defendant contends the trial court, by overruling his objection, was "effectively sanctioning an erroneous burden of proof before the eyes of the jury." Defendant's contention is unconvincing. The State inquired about whether the defense requested fingerprint testing on the cartridge casings only after the defense highlighted the absence of any fingerprint testing by the State. Such an inquiry was appropriate to show both parties possessed an equal ability to request testing and did not shift the burden of proof. *People v. Beasley*, 384 Ill. App. 3d 1039, 1048, 893 N.E.2d 1032, 1040 (2008), a case upon which defendant relies, is factually distinguishable in that the State in that case argued to the jury it was " 'unconscionable' " for the defense not to test certain items.

¶ 69                                    D. Witness Exclusion

¶ 70 Defendant argues the trial court committed reversible error when it precluded the jury from receiving testimony from Simmons. Specifically, defendant asserts the State's objection to the introduction of Simmons's testimony should have been overruled because it was not improper for the defense to review a police report with Simmons. Defendant further asserts the court's error in precluding the jury from receiving Simmons's testimony was not harmless.

¶ 71 To support a claim of error, an appellant "has the burden to present a sufficiently complete record such that the court of review may determine whether there was the error claimed by the appellant." *People v. Carter*, 2015 IL 117709, ¶ 19, 43 N.E.3d 972. Any doubt arising from the incompleteness of the record will be construed against the appellant. *People v. Resendiz*, 2020 IL App (1st) 180821, ¶ 35, 188 N.E.3d 763.

¶ 72 In this case, defendant, as part of his argument before this court, suggests the trial court should not have barred Simmons's testimony "without hearing a formal offer of proof." Defendant did not, however, request to make an offer of proof. Absent an offer of proof, this court,

even if it found the trial court's decision was in error, could not find reversible error. See *People v. Thompkins*, 181 Ill. 2d 1, 10, 690 N.E.2d 984, 988-89 (1998) (noting a primary function of an offer of proof is "to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful"). Accordingly, we conclude defendant has forfeited the issue. See *People v. Boston*, 2016 IL App (1st) 133497, ¶ 64, 54 N.E.3d 217 ("If a criminal defendant claims on appeal that he was not able to prove his case because the trial court improperly barred him from presenting evidence but he failed to make an adequate offer of proof, he forfeits review of the issue on appeal.").

¶ 73                                    E. Photograph

¶ 74        Defendant argues the trial court committed reversible error when it allowed the jury to view his "booking photo" during the State's closing argument. Specifically, defendant asserts his objection to the State's use of the photo should have been sustained because the photograph had not been previously presented at trial. Defendant further asserts the court's error in allowing the jury to receive the photo was not harmless.

¶ 75        This court "may only grant relief if the [trial] court's error prejudiced defendant, as harmless errors do not require reversal." *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 24, 103 N.E.3d 427. An evidentiary error is harmless where there is no reasonable probability the jury would have acquitted the defendant absent the error. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104, 5 N.E.3d 328.

¶ 76        Even assuming, *arguendo*, defendant sufficiently raised an objection to the State's introduction of the photograph as a demonstrative exhibit and the trial court should have sustained that objection, the introduction of the photograph was harmless. Defendant does not dispute the photograph was of him. The photograph, although characterized by defendant as a "booking

photo," depicts defendant's face with no other identifying information. Defendant "believes" the State used the photo because he appeared younger in it, and a witness had described the suspect as a man appearing to be between 30 and 40 years old. Not only is defendant's belief improper speculation, but it is also not supported by this court's review of the State's closing argument. We find there is no reasonable probability the jury would have acquitted defendant absent the introduction of the photograph.

¶ 77                                    F. Sentence Imposed

¶ 78        Last, defendant argues the trial court committed reversible error when it imposed the maximum sentence against him. Specifically, defendant asserts the court failed to "find[ ] a single factor in aggravation or mitigation" before rendering the sentence.

¶ 79        A trial court must consider the factors in aggravation and mitigation set forth in sections 5-5-3.1 and 5-5-3.2 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2018)) before rendering a sentence. The court is not, however, "required to expressly outline every factor it considers for sentencing[,] and we presume the court considered all [aggravating and] mitigating factors on the record in the absence of explicit evidence to the contrary." *People v. Harris*, 2015 IL App (4th) 140696, ¶ 57, 32 N.E.3d 211. Ultimately, the court has broad discretionary powers in imposing a sentence, and its sentencing decision will not be altered on review absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10, 737 N.E.2d 626, 629 (2000).

¶ 80        In this case, the trial court expressly stated it "considered all the factors in aggravation and mitigation" when rendering its sentence. The court found there were many applicable aggravating factors and no applicable mitigating factors. The court separately discussed each mitigating factor. Defendant does not point to any particular aggravating factor and argue it

should not have applied, nor does he point to any particular mitigating factor and argue it should have applied. Based on the record and arguments presented, we find no error in the sentence imposed against defendant.

¶ 81                                    III. CONCLUSION

¶ 82          In summary, defendant has not shown the trial court's decisions related to the evidence presented at his trial or the sentence imposed against him amount to reversible error. Therefore, we affirm the trial court's judgment.

¶ 83          Affirmed.

*People v. Gavin*, 2022 IL App (4th) 200314

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 17-CF-352; the Hon. Robert K. Adrian, Judge, presiding. |
| **Attorneys for Appellant:** | Curt Lovelace, of Lovelace Center for Criminal Law, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |