NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220671-U

NO. 4-22-0671

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CODY ALAN RIDDLE, | ) | No. 22CF248 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice DeArmond and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The appellate court affirmed, finding no plain error when the trial court failed to
ask prospective jurors if they accepted one of the principles set forth in the rule
governing *voir dire* examinations.

¶ 2     Defendant, Cody Alan Riddle, was convicted by a jury of aggravated assault of a

peace officer (720 ILCS 5/12-2(b)(4.1) (West 2020)), two counts of domestic battery (*id.* § 12-

3.2(a)(1),(2)), and resisting or obstructing a peace officer (*id.* § 31-1(a)). On appeal, defendant

seeks plain-error review, arguing the trial court erred when it failed to comply with Illinois

Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                              I. BACKGROUND

¶ 4     In March 2020, defendant was charged with (1) aggravated assault of a peace

officer (count I) for pointing what appeared to be a black handgun at Normal Police Officers

Kyley Hepler and Joshua Harper; (2) two counts of domestic battery (counts II and III) for

kicking Brandi Davis causing bodily harm and making contact of an insulting or provoking nature, respectively, after having been previously convicted of domestic battery; and (3) resisting or obstructing a peace officer (count IV) for running from officers and refusing to drop what appeared to be a black handgun after repeated orders to do so.

¶ 5                                             A. *Voir Dire*

¶ 6            During *voir dire*, the trial court began with an initial panel of 14 prospective jurors. The court stated defendant was "presumed innocent until your determination after deliberations that the defendant is guilty beyond a reasonable doubt." The court then asked each prospective juror: "Do each of you understand this rule of law?" All 14 prospective jurors affirmed they understood. The court then asked if each prospective juror accepted defendant was presumed innocent. All 14 prospective jurors affirmed they did. The court then asked if any of the prospective jurors disagreed with the presumption. None of the prospective jurors disagreed.

¶ 7            The trial court then asked the prospective jurors if they understood, accepted, or disagreed that the State had the burden to prove defendant guilty beyond a reasonable doubt. All of the prospective jurors affirmed they understood and accepted; none stated they disagreed. The same occurred when told defendant was not required to present evidence and if he did not testify, it could not be held against him. All of the prospective jurors affirmed they understood and accepted, and none disagreed. Seven members of the jury were empaneled from this group.

¶ 8            Another set of 14 prospective jurors were brought in, and the trial court began by asking if each prospective juror understood defendant was presumed innocent. All 14 prospective jurors affirmed they understood. The court then asked if any of the prospective jurors disagreed with the presumption. None of the prospective jurors disagreed. The court did not ask any of the prospective jurors in the panel if they accepted defendant was to be presumed

innocent. Defendant did not contemporaneously object to the court's failure to ask any of the prospective jurors if they accepted the rule governing defendant's presumption of innocence.

¶ 9    The trial court then asked all 14 prospective jurors if they understood, accepted, or disagreed that the State had the burden to prove defendant guilty beyond a reasonable doubt, that defendant was not required to present any evidence, and that if he did not testify, it could not be held against him. All of the prospective jurors affirmed they understood and accepted. None of the prospective jurors disagreed. Five members of the jury and one alternate juror were empaneled from this group.

¶ 10    B. Jury Trial

¶ 11    Bobby Jolley testified he was walking on March 9, 2022, when he observed an altercation between defendant and Brandi across the street. Jolley stated he was walking on Henry Street in Normal, Illinois. Jolley witnessed defendant kick Brandi in the head. Jolley approached and asked Brandi if she needed help. Defendant stated the situation "wasn't [a] domestic disturbance." Defendant told Jolley he was trying to kick a cup that Brandi was trying to pick up. Jolley asked Brandi again if she needed help. Defendant stated if Brandi had Jolley call the police, "[T]here would be two dead people." Brandi and defendant then drove away together in a white sport utility vehicle. On cross-examination, Jolley stated he observed defendant, who was wearing boots, strike Brandi's face on the left forehead area. Jolley was walking with his son, who was riding his bike ahead of Jolley.

¶ 12    Brandi testified she was in a dating relationship with defendant and identified him in open court. Brandi and defendant were arguing when she pulled over her white Mitsubishi Outlander on Henry Street in Normal. Brandi got out of the vehicle and sat down on the sidewalk. Defendant got out, and both were screaming and yelling at each other when defendant

kicked a "Pepsi cup" at her. Brandi denied defendant ever kicked her. Brandi stated she did receive injuries that afternoon from hitting her own head against the steering wheel in an attempt to get defendant to "shut up." Brandi told the police she had injuries on her forehead area caused by hitting herself in the head. Brandi told the police she had been injured on her right eye from defendant throwing a lighter at her face during a previous incident. She estimated the injury from the lighter occurred at least 10 days earlier. Brandi admitted she texted her ex-husband, Brad Davis, stating she was going to contact the police about the injuries to her face, implying they were caused by defendant. She stated she sent the text message to get attention from Brad.

¶ 13    Brad testified he observed three "big knots" on Brandi's forehead and the right side of her face was black and blue. Brad stated he did not see those injuries on Brandi's face the Saturday before, approximately four days earlier.

¶ 14    Officer Joshua Harper testified he arrived at the home of Brandi and defendant on the evening of March 9, 2022, to investigate a domestic battery complaint after Jolley reported the incident he observed earlier. At the residence, he observed Brandi's vehicle matching the plate description provided by Jolley. Brandi had a scratch on the bridge of her nose, some "blackening underneath her right eye and some bruising that was becoming more prominent above her right eye." Harper observed Brandi had applied makeup to her right eye to cover the bruising. Harper further described three individual bumps above Brandi's right eye. Defendant told Harper he and Brandi were never near Henry Street and had not been arguing. Defendant said Brandi got out of the vehicle because she was scared of a fly in the car. He said he exited the vehicle and tried to kick the fly.

¶ 15    Harper stated he returned to the residence a second time after receiving more information from Brad and noticed Brandi's "three knots on her forehead were even more

pronounced than the initial contact." When he went to speak with defendant, defendant began to walk away. Harper told him to stop and identified himself as a police officer. Defendant then ran from the police officers into a parking lot. Defendant drew what Harper believed to be a "black pistol" from his waistband and made a "sweeping motion," pointing it at Officers Harper and Kyley Hepler. Harper drew his service weapon and aimed it at defendant, commanding him multiple times to drop the firearm. Defendant did not comply. Defendant eventually threw the gun and stated it was not real. Harper stated he believed the gun to be real and thought defendant was going to shoot him and fellow officers Hepler and Alexander Curry. After securing the weapon, Harper determined it was a plastic BB gun. Harper noted the orange tip, which would ordinarily distinguish the gun as a BB gun, was missing. Defendant told the officers, "I just went to Meijer and bought [the BB gun] for that reason, because I wanted you guys to f*** shoot me."

¶ 16        Officer Hepler's testimony corroborated much of Harper's testimony regarding defendant fleeing and drawing a weapon from his waistband in a sweeping motion. Hepler then chased defendant back to the residence before arresting him. Officer Curry testified he observed defendant flee and pull out a firearm, aiming it at Officers Harper and Hepler. Curry stated defendant then continued to hold the firearm at his side until eventually dropping it and fleeing again.

¶ 17        At the close of the State's evidence, defendant moved for a directed verdict, which was denied. Defendant presented no evidence.

¶ 18        Defendant was found guilty by the jury on all counts.

¶ 19        Defendant filed a posttrial motion that did not include any issues regarding Rule 431(b). The trial court denied the motion. Defendant was sentenced to two concurrent five-year terms in the Illinois Department of Corrections on counts I and II. Count III was merged into

count II. Defendant was given a fine for count IV. Defendant filed a motion to reconsider the sentence, which the court denied.

¶ 20    This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, defendant argues the trial court erred when it failed to properly admonish the jury of Rule 431(b) principles. Defendant acknowledges he failed to preserve this issue for appeal but contends we may excuse his forfeiture pursuant to the plain-error doctrine.

¶ 23                          A. Clear or Obvious Error

¶ 24    The plain-error doctrine is a "narrow and limited exception" allowing reviewing courts to excuse a defendant's forfeited claim of error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). For the doctrine to apply, a defendant has the burden of first demonstrating a clear or obvious error occurred. *Id.* at 545. Whether a forfeited claim is reviewable as plain error is a question of law reviewed *de novo*. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 25    The first step in a plain-error analysis is to determine whether any error occurred at all. *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 41. Therefore, we first assess whether defendant has shown an error occurred. Rule 431(b) requires the trial court to ask each prospective juror:

> "[W]ether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Our supreme court has stated Rule 431(b) mandates a "specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). "The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule." *Id.*

¶ 26    Defendant argues the trial court's failure to ask the second panel of prospective jurors whether they "accepted" the principle that defendant retains the presumption of innocence throughout the trial amounted to clear or obvious error. We agree.

¶ 27    The State argues the trial court complied with Rule 431(b) when it asked the prospective jurors if they disagreed with presuming defendant innocent and all the prospective jurors stated no. The State cites *People v. Belknap*, 2014 IL 117094, ¶ 46, where our supreme court stated it was "arguable that asking jurors whether they disagreed with Rule 431(b) principles is tantamount to asking them whether they accepted those principles."; see *People v. Wilmington*, 2013 IL 112938, ¶ 32 ("[I]t may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles" (Emphasis in original.)).

¶ 28    Our supreme court in both *Belknap* and *Wilmington* found the trial court had erred by failing to ask prospective jurors if they understood the principles set forth in Rule 431(b). *Belknap*, 2014 IL 117094, ¶ 46; *Wilmington*, 2013 IL 112938, ¶ 32. The language the State cites from *Belknap* and *Wilmington* regarding the lack of disagreement being equivalent to acceptance was unnecessary for the disposition of those cases, thereby constituting *obiter dictum*. "*Obiter dictum* refers to a remark or expression of opinion that a court uttered as an aside, and is generally not binding authority or precedent within the *stare decisis* rule." *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 277 (2009).

¶ 29        Additionally, we addressed *Wilmington* in *People v. Curry*, 2013 IL App (4th) 120724. We found *Wilmington* established that "strict compliance with Rule 431(b) is required in that the trial court must ask each juror, individually or as a group, whether he or she 'understands' *and* 'accepts' the principles and provide each juror an opportunity to respond." (Emphasis in original) *Id.* ¶ 64. In *People v. McGuire*, 2017 IL App (4th) 150695, we noted trial courts "must exercise diligence" in order to comply with Rule 431(b) "and must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in that rule." *Id.* ¶ 35; see *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 26 ("The language of Rule 431(b) is clear; the four principles are set forth succinctly, and the two questions to be asked, in whatever manner the court chooses, are simple: 'do you understand' and 'do you accept.' ").

¶ 30        Therefore, when the trial court asked the prospective jurors if they disagreed with a principle of Rule 431(b) rather than if they accepted it, the court committed error.

¶ 31                                B. Plain Error

¶ 32        Having established error, we now turn to whether defendant has shown the error amounts to plain error. Under the plain-error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error in two circumstances:

> "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15.

Under the plain-error doctrine, the defendant carries the burden of persuasion. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 33     Defendant argues plain error occurred because the evidence was closely balanced and, because defendant chose not to present evidence while relying on his presumption of innocence, he was prejudiced. He claims this court should reverse the trial court and remand for a new trial. We disagree.

¶ 34     Under the first prong of the plain-error analysis, we must consider whether "the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. To determine whether the evidence was close, we are required to "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. This analysis "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Defendant only challenges the evidence pertaining to the domestic-battery and aggravated-assault convictions, so we need not address the resisting-or-obstructing-a-peace-officer conviction. We address each in turn.

¶ 35     1. *Domestic Battery Evidence*

¶ 36     For domestic battery, the State had to establish (1) defendant knowingly caused bodily harm to or made physical contact of an insulting or provoking nature with Brandi and (2) Brandi was then a family or household member to defendant. 720 ILCS 5/12-3.2(a)(1),(2) (West 2020).

¶ 37     Defendant argues Jolley did not have a good vantage point from across the street, 20 to 30 feet away, and his attention was divided by his 10-year-old son riding his bike ahead of

him. Additionally, Jolley's description of Brandi being kicked toward the left side of her forehead did not match up with the admitted exhibits, which showed only a visible area of bruising underneath Brandi's right eye. Defendant also notes Hepler did not observe any bumps or welts on Brandi's forehead. Defendant contends Brad's testimony was biased and lacked direct knowledge. Brad and Brandi were going through a "messy" divorce and custody dispute. Brad never saw defendant kick Brandi. When Brad saw Brandi four days earlier and observed no injuries, it was a brief encounter at night. Furthermore, Brandi denied ever being kicked by defendant and explained that her bruising injury was the result of an unrelated matter.

¶ 38      We do not find Jolley's testimony lacked credibility. The evidence shows Jolley had a reasonably close, unobstructed view during daylight. Most of Jolley's testimony lined up with Brandi's testimony, including the vehicle, where it was parked, and that an argument between Brandi and defendant had ensued prior to Brandi being kicked in the face. The only real conflict between the testimonies of Brandi and Jolley was Brandi denying she was kicked in the face and stating defendant had kicked a cup instead. Defendant, through Harper's testimony, denied ever being in an argument with Brandi on Henry Street, but when confronted with contrary accounts, he admitted kicking something, namely a fly.

¶ 39      While Hepler did not observe any knots or welts on Brandi, it does not change the fact that Harper said he observed three distinct marks on Brandi's forehead. Furthermore, Hepler's testimony never established she engaged in direct communication with Brandi. Hepler was an assisting officer on scene and noted in her police report she did not observe any injuries. This may be because Hepler did not interview Brandi directly to assess any injuries. Defendant argues the photographic evidence taken from Harper's body-worn camera did not show any injuries other than Brandi's black eye. But, as defendant also notes, and our review of the record

confirms, the images are very low-quality. The images themselves do not contradict what Brad and Harper testified to: that is, three large knots on Brandi's forehead. These knots are also consistent with Jolley's observation defendant kicked Brandi in the forehead.

¶ 40　　　　Brad's testimony was not offered for purposes of direct knowledge. Brad testified only that he believed defendant had caused the injuries to Brandi based on Brandi's text message, which implied defendant had caused them. Furthermore, only Brandi stated her divorce with Brad was messy. Brad simply answered the questions he was asked regarding what he knew, saw, and heard. Brad's testimony showed Brandi did not have any injuries to her face four days earlier. This diminished Brandi's credibility when she stated she had received her black eye 10 days prior. Further, it was uncontroverted from the record that Brandi and defendant were in a dating relationship at the time of the incident.

¶ 41　　　　Upon reviewing the totality of the evidence and conducting a qualitative, commonsense assessment of the evidence within the context of the case, we find the evidence of domestic battery was not closely balanced.

¶ 42　　　　　　　　　　2. *Aggravated Assault Evidence*

¶ 43　　　　For aggravated assault of a peace officer, the State had to establish (1) defendant knowingly placed Harper in reasonable apprehension of receiving bodily harm, (2) defendant knew Officer Harper was a peace officer, and (3) defendant knew Harper was engaged in the execution of his official duties. 720 ILCS 5/12-1(a), 12-2(b)(4.1)(i) (West 2020).

¶ 44　　　　Defendant argues the testimony and video evidence at trial was unclear that defendant ever actually aimed the BB gun at Officer Harper. Defendant notes his statement that "I just went to Meijer and bought [the BB gun] for that reason, because I wanted you guys to f*** shoot me" suggests his knowledge. However, defendant contends because there is an

absence of any evidence showing he actually pointed the BB gun at the officers, it is equally plausible it could have been aimed at another party, such as another officer—not Harper—or a passerby or vehicle in the area.

¶ 45        The evidence shows defendant knew Harper was a police officer. Defendant had already encountered and spoken to Harper earlier that evening on Harper's first visit. Harper was dressed in his police uniform. When Harper went to make contact with defendant on his second visit, defendant ran from the scene. Defendant did so with the intent to disobey a lawful order from Harper, who was acting within his official capacity as a peace officer by chasing defendant into the parking lot. The issue comes down to whether defendant knowingly placed Harper in reasonable apprehension of receiving a battery. Defendant's statement he bought the gun with the intent to provoke officers to shoot him is ample evidence to show defendant's state of mind that he knowingly sought to place Harper in reasonable apprehension of receiving a battery.

¶ 46        While defendant admits the evidence for aggravated assault may not be questionable, he nevertheless challenges the lack of evidence tending to show he actually pointed the BB gun at Harper. However, three eyewitnesses observed defendant point a gun at Harper. Harper, Hepler, and Curry all testified observing defendant pull out what they perceived as a real handgun. Harper testified he saw the gun pointed at him and the other officers. Hepler, who was 10 to 20 feet behind Harper, stated she saw defendant point the gun toward Harper. Curry, who was further back, stated he saw defendant point the gun at both Harper and Hepler. Therefore, we find the evidence regarding aggravated assault of a peace officer was not closely balanced.

¶ 47        Because we find defendant has failed to show the evidence was closely balanced for either the domestic battery or aggravated assault of a peace officer, he has failed to establish plain error.

¶ 48                              III. CONCLUSION

¶ 49        For the reasons stated, we affirm the trial court's judgment.

¶ 50        Affirmed.