NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230392-U

NO. 4-23-0392

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 3, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| KENNETH D. BRINKLEY, | ) | No. 22CF40 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Michael L. Stroh, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Harris and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt, (2) the trial court's failure to strictly comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) did not constitute plain error where the evidence was not closely balanced, (3) the court properly considered the statutory sentencing factors when it sentenced defendant to an aggregate of 13 years in prison, and (4) defendant was not denied the effective assistance of trial counsel.

¶ 2        In September 2022, defendant, Kenneth D. Brinkley, was convicted of aggravated driving under the influence (DUI) (625 ILCS 5/11-501(a)(2), (d)(1)(F) (West 2022)), criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2022)), and three counts of aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(2), (3) (West 2022)). In February 2023, the trial court sentenced defendant to an aggregate of 13 years in the Illinois Department of Corrections (DOC).

¶ 3        Defendant appeals, arguing (1) the evidence was insufficient to prove his guilt beyond a reasonable doubt, (2) the trial court committed plain error when it failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (3) the court committed plain error by declining to consider mercy as a mitigating factor when it sentenced him, and (4) his trial counsel provided ineffective assistance by failing to preserve errors for review. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        On April 7, 2022, defendant was charged by indictment with five counts. Count I alleged aggravated DUI (625 ILCS 5/11-501(a)(2), (d)(1)(F) (West 2022)), in that defendant knowingly drove a motor vehicle under the influence of alcohol and was involved in a motor vehicle accident, proximately causing the death of Ryan Pitts, a passenger in defendant's vehicle. Count II alleged criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2022)) in that defendant knowingly and without authority damaged a squad car that was funded by the Woodford County Sheriff's Office and the damage exceeded $500 but did not exceed $10,000. Counts III through V alleged aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(2), (3) (West 2022)) in that defendant drove a motor vehicle upon a public highway and was fleeing or attempting to elude Deputy Colten Zehr at a time he had been given an audio or visual signal from Deputy Zehr to stop and said flight caused damage to a squad car in excess of $300 (count III), bodily injury to Pitts (count IV), and bodily injury to defendant (count V).

¶ 6        The charges arose from a police pursuit of a utility task vehicle (UTV) and the UTV's collision with a tree, which resulted in the death of Pitts. Defendant presented a defense that he was not driving the UTV at the time of the accident. Following a jury trial, defendant was convicted of all five counts.

¶ 7                                          A. *Voir Dire*

¶ 8          While conducting *voir dire*, the trial court explained to the prospective jurors (1) defendant was presumed innocent of the charges against him, (2) before defendant could be convicted, the State must prove him guilty beyond a reasonable doubt, (3) defendant was not required to offer any evidence on his own behalf, and (4) if defendant did not testify, it could not be held against him. After providing each proposition, the court asked the prospective jurors as a group to raise their hands if they understood the proposition. The prospective jurors raised their hands. After each proposition, the court also asked the prospective jurors as a group to raise their hands if they disagreed with the proposition. No prospective juror raised their hand.

¶ 9                                          B. Jury Trial

¶ 10          At defendant's jury trial, the State presented the testimony of Deputy Dakota Park and Deputy Zehr of the Woodford County Sheriff's Office, Trooper Christopher McClenning and Master Sergeant Bradley Brachear of the Illinois State Police, and Dr. Kurt Piening of OSF HealthCare. Defendant testified on his own behalf.

¶ 11                                         1. *Deputy Park*

¶ 12          Deputy Park testified he worked as a patrol sergeant. On March 15, 2022, he was working on traffic patrol in his marked patrol vehicle. Around midnight, he observed a UTV parked at an intersection that gained his interest because it was not typical for those types of vehicles to be out at that time. The UTV was parked at a stop sign for quite some time, and he approached to inquire what was going on. As he began to put down his driver's side window, the UTV was put into gear and took off. Deputy Park activated his lights and asked Deputy Zehr to help him stop the UTV. Further, Deputy Park identified defendant as the driver, who was wearing a red or orange colored shirt. Deputy Zehr notified Deputy Park the UTV had hit his patrol vehicle,

and he was pursuing the UTV. The UTV drove through a field while the deputies drove on the road. Deputy Park lost visual of the UTV for approximately 45 seconds. Deputy Zehr notified Deputy Park there had been a vehicle accident. He headed to the crash site, where he observed the UTV against a tree and defendant in the UTV screaming. He spoke with defendant, who denied driving the UTV. A video recorded by Deputy Park's dash camera was admitted into evidence.

¶ 13        On cross-examination, Deputy Park testified the UTV was on its driver's side post-crash. He observed Pitts hanging from the roof of the UTV, brain matter on the ground in front of the roof, and blood on the ground near the brain matter. Deputy Park then asked defendant to get out of the UTV, and defendant replied he could not move. Deputies Park and Zehr helped defendant get out of the UTV.

¶ 14                    2. *Deputy Zehr*

¶ 15        Deputy Zehr testified he was primarily a patrol officer. On March 15, 2022, he responded to a call from Deputy Park, who reported a UTV had taken off away from him. He was not far from the area and saw lights in a nearby field. Deputy Zehr activated his patrol lights. He testified defendant was driving the UTV and wearing a bright-colored shirt, which was orange or red. The UTV drove toward him and hit the front of his squad car. The UTV then drove through a field while Deputy Zehr was driving on the road parallel to it. As he continued driving forward, approaching another road, he saw defendant standing up in the UTV and Pitts hunched over the roof. Defendant complained his arm was broken. Deputy Zehr's dash camera video was admitted into evidence. In the video, Deputy Zehr can be heard saying the man wearing black (Pitts) was driving. After watching the video, Deputy Zehr believed defendant was driving.

¶ 16                    3. *Trooper McClenning*

¶ 17    Trooper McClenning testified he worked for the traffic crash reconstruction unit, was certified in traffic crash investigation, and received ongoing training. According to Trooper McClenning, the physics principles for crash reconstruction remained the same for a UTV. The State moved to tender Trooper McClenning as an expert in traffic crash reconstruction, and defendant conducted *voir dire*. Trooper McClenning testified he received no UTV crash reconstruction training but explained his analysis still involved objects and he could calculate speed and distance. Whether the UTV had a roof or doors did not factor into his analysis, just as it would not for other vehicles. Over defendant's objection, the trial court allowed Trooper McClenning to testify as a traffic reconstruction expert.

¶ 18    Trooper McClenning testified, on March 15, 2022, he was called to investigate a crash involving a UTV. When he arrived at the scene, he talked with the officers to determine the directions of travel and photographed the scene. He obtained measurements, flew a drone to render a scale diagram, and collected video from the dash cameras. The videos showed when (1) Deputy Park encountered the UTV, the driver was wearing an orange shirt and the passenger was wearing a dark shirt, (2) Deputy Zehr first encountered the UTV and it struck his patrol vehicle, the driver was wearing an orange shirt, and (3) Deputy Zehr approached the UTV post-crash, defendant was wearing an orange shirt and climbing out of the top of the UTV.

¶ 19    Trooper McClenning calculated from the videos there were 55 seconds when the UTV was out of the officers' view. He used a drone to view tire marks and approximated the UTV traveled 3109 feet in those 55 seconds at an average speed of 38.55 miles per hour. His investigation did not indicate the UTV stopped as it drove through the field, and thus, his calculations did not include a stop. He found the UTV traveled through the field and encountered an incline, where it became airborne and landed on the road. He estimated the UTV was travelling

30.87 miles per hour at that time. Tire marks showed the UTV rotated sideways and the passenger-side tires dug into the grass and acted as a tripping mechanism. The UTV began to roll on its passenger side onto its roof and finally rested on the driver's side (three quarters of a complete roll). The State admitted into evidence a demonstrative exhibit, and McClenning showed the UTV's path using a 1/14 scale model.

¶ 20 Trooper McClenning concluded the passenger of the vehicle was partially ejected as the UTV continued to roll and the passenger's body was "hung up." He believed this was why Pitts's body was slumped over the roof. He also made note of Deputy Zehr's video from when he approached the UTV post-accident. The video showed movement down toward the steering wheel area and then a man with an orange shirt stood up through the passenger side. He explained the driver did not get thrown from the vehicle because the passenger's body would have prevented that as the UTV was rolling. He also found the windshield and the back window would have prevented anyone from being ejected in those directions during the rollover. Therefore, he opined defendant was driving the UTV.

¶ 21 On cross-examination, Trooper McClenning testified it was not possible the driver and passenger could have switched places during the rollover because, as the UTV rolled, centrifugal force was taking objects to the outside. However, he noted the driver's seatbelt was buckled behind the driver and the passenger's seatbelt was off and retracted. He clarified his testimony was not that defendant was seated in the driver's seat when Deputy Zehr approached post-accident, but rather, defendant was down in the driver's area and then stood through the passenger compartment where he attempted to climb up. All of the discovered blood was found outside of the UTV. When asked why portions of Pitts's head and blood were near the front of the UTV and on the exterior of the driver's side, he explained when the UTV came to a rest on the

driver's side, Pitts was slumped over the roll cage area for a couple of hours and his blood had drained down.

¶ 22                                    4. *Master Sergeant Brachear*

¶ 23           Master Sergeant Brachear testified he was certified in traffic crash investigation and received ongoing training. He explained an investigation involving a UTV changes some mechanics, such as a higher potential for rolling due to a higher center of gravity, but occupant kinematics and the basic functions of the vehicle were very similar to a standard vehicle. The trial court allowed him to testify as an expert in traffic crash reconstruction. He testified he assisted Trooper McClenning in confirming the seating positions of the occupants by observing the direction of rotation, the occupants' positioning, which direction the occupants would travel during the rollover, and which way they would be ejected out of the vehicle. He explained when a vehicle trips, rolls, and comes to a rest, the occupants are moving in the same direction and are not going to cross paths. He opined defendant was driving the UTV.

¶ 24                                    5. *Dr. Piening*

¶ 25           Dr. Piening was established as an expert in the field of emergency medicine. He examined defendant on the night of the accident and noted defendant was intoxicated. Defendant told him that he had been riding with a companion in a UTV, the UTV wrecked, and he had been thrown from it. Defendant could not remember the accident or whether he was restrained. Defendant suffered a right clavicle fracture and scapular fracture. Dr. Piening opined these types of injuries were caused by any blunt force trauma to the right shoulder, which could include holding onto a steering wheel or an arm bar on the passenger side of a vehicle upon impact.

¶ 26                                    6. *Defendant*

¶ 27        Defendant testified he had been best friends with Pitts for about five or six years. On March 15, 2022, around 5:30 p.m. to 6:30 p.m., defendant went to Pitts's home, where they grilled, drank alcohol, and had a bonfire. Pitts asked defendant if he wanted to go for a ride in his UTV. Defendant accepted Pitts's offer, and Pitts drove them on back roads until they realized they were low on gas. Pitts drove them to the gas station. When they departed the gas station, defendant remained in the passenger seat. Video from the gas station was admitted into evidence. They then drove into a field and approached a stop sign, where defendant and Pitts switched seats. Defendant drove forward and approached another stop sign. He saw a vehicle approaching and believed it was turning, as it was slowing down and the road was a common route. Defendant did not know the vehicle was a police vehicle. Defendant decided to turn and cut into a field. Once he approached the end of the field and drove back onto the road, he observed a police vehicle with its lights on. He pulled out and collided with the police vehicle.

¶ 28        Defendant did not know he collided with the police vehicle until after he noticed he was being chased by the police. He continued to drive while being chased for about two minutes, and then he pulled alongside a tree line, where he and Pitts switched seats. Defendant jumped out of the driver's seat and ran around the UTV to get into the passenger's seat. Pitts remained in the UTV and moved over into the driver's seat. The plan was to go to Pitts's parents' house, where they would contact Pitts's girlfriend to pick them up. It was around midnight, and defendant did not know where Pitts's parents' home was located. Pitts drove them through a field at around 30 miles per hour as he approached a road. Defendant noticed they were going fast and spotted an incline before the road. Defendant used both hands to brace himself on the support bar located on the passenger's side of the UTV. Defendant next recalled standing up and seeing Pitts lying over the roof of the UTV. Defendant was approached by police officers, and he told them he could not

move. The officers pulled him out of the UTV. The officers asked defendant what happened, and defendant said he was not driving.

¶ 29    On cross-examination, defendant acknowledged the video evidence showed a police vehicle slowing down to approach him and him driving off. Defendant claimed he did not see the officer's lights activate because the UTV's rearview mirror was missing. As to the second encounter with a police vehicle, he did not realize he hit the police vehicle because he only brushed the front. However, he acknowledged he was fairly intoxicated. Defendant stated he wanted to stop driving the UTV, but Pitts told him to go. The police lost sight of the UTV for about 45 seconds, and defendant claimed during that time he came to a complete stop, switched seats with Pitts, and the UTV regained speed to make it through the field.

¶ 30                                7. *Stipulations*

¶ 31    The parties made four stipulations: (1) laboratory tests performed at the hospital following the accident reported defendant's blood alcohol content was 0.209, (2) defendant had been previously convicted of a felony offense, (3) Deputy Zehr's vehicle was owned and maintained by Woodford County, which sustained $2890.73 in damage, and (4) Pitts's cause of death was craniocerebral injuries due to a UTV striking a fixed object, reportedly sustained as the occupant of the UTV that struck a tree at a high rate of speed.

¶ 32                                8. *Verdict*

¶ 33    After closing arguments and deliberations, the jury found defendant guilty of aggravated DUI, criminal damage to government supported property, and three counts of aggravated fleeing or attempting to elude a peace officer.

¶ 34                          C. Postjudgment Motions

¶ 35 Defendant's counsel filed a motion for leave to withdraw, citing irreconcilable differences between counsel and defendant. The trial court allowed the motion. Defendant's new counsel filed a motion for a judgment notwithstanding the verdict or a new trial. Defendant argued there was insufficient evidence to support his conviction for aggravated DUI. The court denied the motion, finding it would not replace the jury's credibility determinations with its own.

¶ 36                                          D. Sentencing

¶ 37 The trial court proceeded to sentencing and considered the presentence investigation report, financial impact statement, arguments presented by the parties, defendant's statement in allocution, victims' statements, and sentencing alternatives. In mitigation, the court found defendant did not contemplate his criminal conduct would cause or threaten serious physical harm to another. In aggravation, the court found as follows. Defendant had a history of prior criminal activity, starting in August 2017. Further, defendant had convictions for criminal damage to property; domestic battery; violation of an order of protection; criminal trespass to land; DUI, where he was sentenced to 300 days in jail; robbery, where he was sentenced to three years in DOC; and criminal damage to government supported property, where he was sentenced to three years in DOC. Defendant was on mandatory supervised release at the time the offenses in this case occurred. The court found other courts recognized early on that defendant was in need of either mental health or alcohol treatment, but defendant's alcohol use only accelerated, despite previously receiving sentencing alternatives, which were ultimately revoked. The court found a prison sentence was necessary in this case to deter others from committing the same crime.

¶ 38 The trial court discussed the concept of mercy and stated, as follows:

"And I am asked in many of the letters that I received from [defendant's] friends and family to consider mercy. And I always struggle with that. And I've

thought long and hard about what mercy means. And everybody has a different definition. But mercy is not something that I give. That is not my job. Mercy is something that God gives us. Grace is something that God gives us. My job is to enforce and uphold the laws of the State of Illinois.

And there's a statement in the Bible that goes something like *** give unto Caesar what belongs to Caesar and give unto God what belongs to God. So the mercy and grace that you seek, [defendant], and that your family seeks for you, that comes from God. That comes from a higher being than what we are. I as a judge have to impose the laws of Caesar, so to speak, the State of Illinois."

¶ 39 Defendant was eligible for 3 to 14 years in DOC, to be served at 85%, for aggravated DUI, an extended term of 2 to 10 years in DOC for criminal damage to government supported property, and an extended term of 1 to 6 years in DOC for aggravated fleeing or attempting to elude a peace officer. Defendant was eligible to serve the sentences concurrently or consecutively. The trial court found counts III through V for aggravated fleeing or attempting to elude a peace officer fell within the one-act, one-crime doctrine and merged them into count IV, pertaining to causing bodily injury to Pitts (625 ILCS 5/11-204.1(a)(2) (West 2022)).

¶ 40 When considering defendant's prior criminal history, the facts and seriousness of this case, and the victim impact statements, the trial court found a sentence of imprisonment was necessary to protect the public. The court sentenced defendant to concurrent sentences of 13 years in DOC for aggravated DUI, 7 years in DOC for criminal damage to government supported property, and 3 years in DOC for aggravated fleeing or attempting to elude a peace officer.

¶ 41 Defendant filed a motion to reconsider the sentence, arguing the trial court did not give sufficient weight to his rehabilitative potential. Specifically, defendant contended his criminal

history was associated with alcohol abuse and he took affirmative steps to address it by attending meetings and church services. The court denied the motion.

¶ 42          This appeal followed.

¶ 43                              II. ANALYSIS

¶ 44          Defendant presents three main arguments on appeal. First, defendant contends the State failed to present sufficient evidence to prove his guilt beyond a reasonable doubt with respect to his convictions for aggravated DUI and aggravated fleeing or attempting to elude a peace officer. Second, defendant argues the trial court committed plain error by failing to ask the jurors whether they accepted the principles enumerated in Rule 431(b). Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Third, defendant contends the court committed plain error when it refused to consider mercy in mitigation. Defendant alternatively argues his counsel was ineffective for failing to preserve these errors for review. We address each argument in turn.

¶ 45                      A. Sufficiency of the Evidence

¶ 46          When a defendant challenges the sufficiency of the evidence, a reviewing court considers, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28. The trier of fact determines the credibility of the witnesses, assigns weight to testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). "We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 47          Both aggravated DUI (625 ILCS 5/11-501(a)(2), (d)(1)(F) (West 2022)) and aggravated fleeing or attempting to elude a peace officer (*id.* § 11-204.1(a)(2)) required the State

to prove defendant was driving the UTV. Defendant disputes the sufficiency of the evidence as to the driving element of these offenses. Defendant argues the evidence failed to support the finding he was driving when the UTV was outside of the officers' view for 55 seconds as it traversed through the field and at the time of the accident. In support of his argument, defendant points to his testimony and statements at the scene where he said he was not the driver, Deputy Zehr's dash camera video from the scene where the deputy identified Pitts as the driver, and the testimony of the crash reconstructionist. The State responds the jury rightfully rejected defendant's version of events because his testimony was implausible and unbelievable. The State maintains the evidence was sufficient to support the convictions.

¶ 48       We first address defendant's statement at the scene of the accident and his testimony. Defendant admitted he was driving when Deputy Park first approached and when the UTV collided with Deputy Zehr's patrol vehicle. However, defendant testified he switched seats with Pitts, who was driving the UTV through the field leading up to the crash and when the UTV crashed. When the police were determining what happened after the accident, defendant told them he was not driving. Further, defendant argues this post-accident statement is inherently reliable because it was made without time to reflect and create a different response, and he was so seriously injured he did not have the ability to fabricate a story.

¶ 49       In considering the evidence in the light most favorable to the State, defendant's version of the events arguably has various credibility issues, and the jury was within its right to reject defendant's version of events. According to defendant, when he was first approached by Deputy Parks, he claimed he did not realize the approaching vehicle was a police vehicle, yet he still drove off in an evasive manner into a field and claimed he did not realize he was being pursued. Deputy Park's dash camera video showed how close he was to the UTV, and he activated his lights

- 13 -

immediately. Defendant also claimed he did not realize he hit the front of Deputy Zehr's patrol vehicle, as he only brushed the front of it. Defendant's characterization of brushing against the vehicle versus hitting it is dubious. Deputy Zehr's dash camera video shows defendant approached the police vehicle, which had its lights activated, nearly head-on, and there was a loud crash when the vehicles collided. The stipulated evidence demonstrated the collision resulted in $2890.73 in damage. Additionally, defendant admitted to continuing to drive for two minutes once he realized he was being chased.

¶ 50　　　　As to the 55 seconds without video evidence, defendant testified it was during that time he and Pitts switched places as driver and passenger. Trooper McClenning calculated the UTV traveled 3109 feet in those 55 seconds at an average speed of 38.55 miles per hour. This calculation does not consider defendant's claim that he stopped the UTV and ran around to the passenger side, Pitts moved over from the passenger's seat and began driving, and the UTV regained its speed. If the calculation did consider the stop, the UTV's average speed would have been increased to account for the decreased time spent driving. This assertion also calls defendant's testimony into question, as he claimed Pitts drove the UTV at around 30 miles per hour. The evidence additionally demonstrated the UTV rolled onto its passenger side first, which explained why Pitts, as the passenger, would have been the one ejected out the of the vehicle. Pitts' position as the passenger was also consistent with his injuries, as it appeared he was pinched under the UTV as it rolled, and his blood was not found inside the UTV. Trooper McClenning explained it would have been very difficult for the driver and passenger to switch places during the rollover, as they were being pulled in the same direction. Although defendant claimed he was the passenger, as evinced by his injuries, Dr. Piening testified blunt force trauma to the right shoulder could be

caused by holding onto a steering wheel or an arm bar upon impact. Defendant's own testimony and the laboratory reports indicate defendant was intoxicated.

¶ 51        When defendant was being treated by Dr. Piening immediately following the accident, he reported being thrown from the UTV and was unable to remember the crash itself. However, defendant's own testimony and Deputy Zehr's dash camera video showed defendant was not thrown from the UTV, but rather, he was unable to get out of the UTV without assistance. The State's evidence, combined with defendant's prior felony conviction, may have caused the jury to question defendant's believability as a witness.

¶ 52        Defendant heavily relies upon Deputy Zehr's dash camera video post-accident, when Deputy Zehr can be heard identifying the man wearing black (Pitts) as the driver. However, Deputy Zehr later testified he believed defendant was driving the UTV. The record contains no evidence as to why Deputy Zehr initially believed Pitts was driving the UTV. Regardless, this discrepancy does not favor defendant's version of events, where Deputy Zehr's dash camera video showed his perspective during his entire interaction with the UTV and never showed Pitts driving. In other words, even assuming, *arguendo*, Deputy Zehr testified Pitts was driving the UTV, his testimony would be at odds with his dash camera video, as it only ever showed defendant driving the UTV.

¶ 53        Additionally, defendant argues the testimonies of the crash reconstruction experts were confusing, vague, and incomplete. Defendant asserts Trooper McClenning's testimony using the demonstrative exhibit to explain the UTV's path was vague, with such references as "through here," in "this direction," and "sideways." Defendant contends the reader cannot objectively verify what was being said. First, we note the demonstrative exhibit was supplied as a supplement to the testimony Trooper McClenning had already provided. When taking the testimony as a whole, it

provides a full and complete explanation of Trooper McClenning's findings. Second, any confusing, vague, or incomplete testimony was a result of the parties' failure to make a proper record of what the expert witnesses were pointing at or describing while using the demonstrative exhibit. The jury, as the trier of fact, had the benefit of viewing the demonstrative exhibit as the witnesses explained the UTV's path. We do not have the same benefit due to the parties' failure to make a proper record. Defendant, who now challenges the State's theory of guilt, failed to meet his burden of making a proper record to support his contention of error, and this failure is to his detriment. See *People v. Gavin*, 2022 IL App (4th) 200314, ¶ 71. Therefore, we find defendant's argument is fundamentally flawed.

¶ 54        Although there was evidence presented to support defendant's version of events, there was also sufficient evidence to refute it. A conflict in the evidence does not justify a reversal where there is sufficient credible evidence to sustain the convictions. *People v. Sheppard*, 402 Ill. 347, 351 (1949). We decline to reweigh the evidence and reiterate it was the jury's role to determine the credibility of the witnesses, assign weight to the testimony, resolve conflicts in the evidence, and draws reasonable inferences from that evidence. *Jackson*, 232 Ill. 2d at 280-81. For these reasons, we cannot find the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of defendant's guilt.

¶ 55                                B. Rule 431(b)

¶ 56        Defendant argues the trial court erred when it failed to ask the prospective jurors whether they accepted the principles enumerated in Rule 431(b). Defendant concedes he forfeited this claim because he did not object during *voir dire* or raise the issue in his posttrial motion. However, he argues this claim may be reviewed for plain error.

¶ 57                                1. *Plain Error*

¶ 58 To preserve an alleged error for review, a criminal defendant must object at trial and include the alleged error in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). A defendant's failure to preserve the alleged error results in forfeiture of his claim. *Id.* at 612. However, this court may consider a forfeited claim when the defendant demonstrates a plain error affecting his substantial rights occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Pursuant to the plain-error doctrine, the defendant must demonstrate a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The defendant bears the burden of persuasion under either prong. *People v. Adams*, 2012 IL 111168, ¶ 21. We first determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 59 Rule 431(b) requires the trial court to ask each prospective juror, either individually or in a group:

> "[W]hether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 60 Here, the trial court recited the four propositions in Rule 431(b) to the jury and asked whether they understood them and whether they disagreed with them. Defendant argues the

court was required to ask whether the jury accepted the propositions rather than disagreed with them. The State contends (1) the alleged error is merely arguable error rather than clear and obvious error and (2) no error occurred because when the court asked whether the prospective jurors disagreed with the principles, it was effectively asking if the jury accepted them, which complied with Rule 431(b). We disagree.

¶ 61    Our supreme court has explained a trial court complies with Rule 431(b) by asking each juror whether he or she understands *and* accepts the principles. *People v. Wilmington*, 2013 IL 112938, ¶ 32. This court has analyzed *Wilmington* and found the supreme court made clear strict compliance with Rule 431(b) is required. *People v. Curry*, 2013 IL App (4th) 120724, ¶ 64. Trial courts must exercise diligence to comply with Rule 431(b) and must not deviate in any way from the precise language chosen by the supreme court to be in that rule. *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35; see *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 26 (finding the language in Rule 431(b) is clear the two questions to be asked are simple: " 'do you understand' " and " 'do you accept' ").

¶ 62    Therefore, when the trial court asked the prospective jurors if they disagreed with the principles set forth in Rule 431(b), rather than if they accepted them, the court erred. *People v. Riddle*, 2023 IL App (4th) 220671-U, ¶¶ 26-30; see *Curry*, 2013 IL App (4th) 120724, ¶ 65 (finding the court failed to ask and provide each juror an opportunity to respond to the question "do you accept"). Having established error occurred in this case, we now must decide whether defendant has shown the error amounts to plain error.

¶ 63    Defendant only argues plain error occurred under the first prong in that the evidence was closely balanced. He contends (1) the evidence on one key point was largely based upon credibility, (2) he consistently stated he was not driving, (3) the testimony of the crash

reconstruction experts was vague and failed to show what they were describing, and (4) the evidence failed to explain how his injuries could have occurred if he was the driver, as his injuries were on his right side and consistent with having been the passenger.

¶ 64 Whether evidence is closely balanced is a separate question from whether the evidence is sufficient to sustain a conviction. *Piatkowski*, 225 Ill. 2d at 566. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. This involves assessing the evidence on the elements of the charged offenses along with any evidence regarding the witnesses' credibility. *Id.* This analysis does not involve the sufficiency of close evidence, but rather, the closeness of sufficient evidence. *Stevens*, 2018 IL App (4th) 160138, ¶ 71.

¶ 65 Here, defendant only contested he was driving at the time of the incident and when the UTV was fleeing from the deputies immediately before the crash, which resulted in Pitts's death. The State presented (1) testimony from Deputies Park and Zehr, who were engaged in a pursuit of the UTV, observed defendant driving, and believed defendant was driving when the UTV fled through the field and at the time of the accident; (2) testimony from Trooper McClenning and Master Sergeant Brachear, who conducted a detailed reconstruction of the scene and also concluded defendant was driving when the UTV fled through the field and at the time of the accident; and (3) dash camera videos corroborating the officers' recollection of events. Defendant's testimony regarding the events that took place that night was largely contradicted and implausible, which called his credibility into question. Dr. Piening provided the only medical testimony and stated defendant's injury could have occurred under either the State's theory or defendant's theory.

¶ 66       Therefore, although there were conflicting accounts as to who was driving when the UTV fled through the field and at the time of the accident, only the officers' accounts were plausible and supported by corroborating evidence. Evaluating the totality of the evidence and conducting a qualitative, commonsense assessment, we conclude that the evidence was not closely balanced. See *Sebby*, 2017 IL 119445, ¶¶ 61-62 (holding the evidence was closely balanced where there were two conflicting credible accounts, both accounts were plausible, and neither version was supported by corroborating evidence); *People v. Naylor*, 229 Ill. 2d 584, 607-08 (2008) (holding the evidence was closely balanced where the defendant's testimony was consistent with much of the officers' testimony, the different accounts were plausible, and no extrinsic evidence corroborated either's version of events). Accordingly, reversal is not warranted under the plain error doctrine.

¶ 67                          2. *Ineffective Assistance of Counsel*

¶ 68       Defendant alternatively argues he received ineffective assistance of counsel where his trial counsel failed to object to the trial court's erroneous Rule 431(b) questioning and his posttrial counsel failed to preserve the error in a posttrial motion. The State responds counsel was not ineffective because the decisions of when to object and which issue to raise in a motion to reconsider represent matters of judgment and trial strategy.

¶ 69       The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In determining whether defendant was denied effective assistance of counsel, we apply the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To prevail on such a claim, a criminal defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial."

*People v. Brown*, 2023 IL 126852, ¶ 11. Therefore, failure to establish either prong of this test will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). When a defendant raises his claim of ineffective assistance of counsel for the first time on appeal, this court's review is *de novo*. *People v. Fox*, 2022 IL App (4th) 210262, ¶ 129.

¶ 70        Here, defendant's argument is based on the trial court failure to comply with Rule 431(b) and his counsels' failure to preserve that error for review. However, we find defendant has failed to demonstrate he was prejudiced. A trial court's failure to comply with Rule 431(b) does not automatically result in a biased jury. *Thompson*, 238 Ill. 2d at 610. The questioning set forth in Rule 431(b) is merely one way of helping to ensure a fair and impartial jury. *Id.* at 610-11. Defendant points to no evidence suggesting the jury was biased and he suffered prejudice as a result of his counsel's failure to object to the Rule 431(b) questioning. As we have already concluded the evidence in this case was not closely balanced, defendant cannot demonstrate the outcome of his trial would have been different had counsel objected to the court's Rule 431(b) questioning. See *Curry*, 2013 IL App (4th) 120724, ¶ 93 (finding no evidence demonstrated the jury was biased where the trial court failed to comply with Rule 431(b) and the defendant could not demonstrate prejudice where the evidence was not closely balanced). Therefore, defendant was not denied the effective assistance of trial counsel.

¶ 71                                    C. Sentencing

¶ 72        Defendant argues he did not receive a fair sentencing hearing where the trial court declined to consider mercy in mitigation. Again, he acknowledges he failed to preserve this issue for review and asks this court to review it for plain error. The State argues mercy is not a statutory factor the court must consider, and therefore, the court did not err. The State also maintains the court properly considered the statutory factors and the evidence before it.

¶ 73                                    1. *Plain Error*

¶ 74        As previously explained, our first step in a plain-error analysis is to determine whether any error occurred. *Eppinger*, 2013 IL 114121, ¶ 19.

¶ 75        The trial court has broad discretionary powers when imposing a sentence. Ill. Const. 1970, art. I, § 11; *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). An appropriate sentence must be based upon the particular circumstances of an individual case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for deterrence and punishment. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 63. The court is also to consider appropriate aggravating and mitigating factors as set forth in the Unified Code of Corrections. See 730 ILCS 5/5-5-3.1(a) (West 2022) (mitigating factors); *id.* § 5-5-3.2(a) (aggravating factors). However, the court does not need to recite and assign value to each factor considered. *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22. A sentence imposed by the trial court will not be reversed absent an abuse of discretion. *Pina*, 2019 IL App (4th) 170614, ¶ 20.

¶ 76        Defendant asserts the trial court erred when it declined to consider mercy as a mitigating factor, which ultimately caused the court to sentence him near the maximum sentence allowed. He fails to cite any authority explicitly providing mercy is a factor the court must consider in mitigation. Instead, he contends the statute pertaining to the mitigating factors (730 ILCS 5/5-5-3.1(a) (West 2022)) emphasizes "the importance of mitigation, allocution, and opportunities to consider lesser sentences, *i.e.*, mercy." However, the record clearly establishes the court

considered the presentence investigation report, financial impact statement, arguments presented by the parties, defendant's statement in allocution, victims' statements, and sentencing alternatives. Moreover, defendant's sentences are within the statutory range. We also note the court did not order defendant to serve these sentences consecutively.

¶ 77　　　　Additionally, defendant claims the trial court only cited one factor in mitigation and spent more time on the factors in aggravation. However, he only argues on appeal the court failed to consider mercy in mitigation, which we already decided was not in error. The record demonstrated there were more factors for the court to examine in aggravation rather than in mitigation and it properly considered those factors in sentencing defendant. Therefore, we cannot find the court abused its discretion when it sentenced defendant to 13 years in DOC. Because we have determined the court did not abuse its discretion when it considered the statutory factors in mitigation and aggravation, no error occurred, and our plain-error analysis ends here.

¶ 78　　　　　　　　　2. *Ineffective Assistance of Counsel*

¶ 79　　　　Defendant alternatively argues his counsel was ineffective for failing to preserve his claim the trial court erred when it declined to consider mercy as a mitigating factor. To demonstrate ineffective assistance of counsel, defendant must show both (1) counsel's performance was deficient and (2) the deficient performance prejudiced him. *Brown*, 2023 IL 126852, ¶ 11. However, as we already concluded the court properly considered the statutory factors and evidence before it when sentencing defendant, there is no reasonable probability a motion to reconsider defendant's sentence would have been granted on that basis. Thus, counsel's decision to not include this issue in the motion to reconsider the sentence did not prejudice defendant, and thus, it did not constitute ineffective assistance of counsel. See *People v. Caffey*,

205 Ill. 2d 52, 133 (2001) (disposing of the defendant's claim of ineffective assistance of counsel on the prejudice prong alone where, if counsel had objected, the result would have been the same).

¶ 80                          III. CONCLUSION

¶ 81          For the reasons stated, we affirm the trial court's judgment.

¶ 82          Affirmed.