NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 220959-U

NO. 4-22-0959

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| ARENZA BROWN, | ) | No. 21CF250 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held:* The substantive admission of prior statements by a witness lacking personal
knowledge did not rise to the level of plain error requiring reversal, and the trial
court did not err in admitting photographic and video evidence.

¶ 2    Following a jury trial, defendant Arenza Brown was convicted of felony murder
(720 ILCS 5/9-1(a)(3) (West 2020)), attempted armed robbery (*id.* § 18-2(a)(2)), and aggravated
unlawful use of a weapon (*id.* § 24-1.6(a)(2)). He was sentenced to 38 years in prison on the felony
murder charge and received a concurrent 3 year sentence for aggravated unlawful use of a weapon.
The attempted armed robbery was the underlying charge for the felony murder conviction, and it
merged. In this direct appeal, defendant argues that (1) he was denied a fair trial where a witness's
prior inconsistent statements were improperly admitted as substantive evidence and (2) the trial
court erred in allowing certain exhibits into evidence where their probative value was substantially
outweighed by the possibility of unfair prejudice. For the reasons that follow, we affirm.

¶ 3                          I. BACKGROUND

¶ 4                    A. Surveillance Footage of Incident

¶ 5            Just before midnight on May 9, 2021, Joshua Perkins was murdered while sitting in a parked vehicle at a Shell gas station in Peoria, Illinois. Security video from the gas station captured the incident and was submitted as evidence at trial. The video shows defendant exiting a black Jeep parked in front of the store portion of the gas station. The Jeep was parked so the driver would be facing the fuel pumps. A silver Chevrolet Malibu was parked directly across from the Jeep. Defendant walked towards the Malibu and began talking to the occupants. Eventually, Demarian Palmer (Palmer) stepped out of the Malibu and joined defendant outside the vehicle, where they both continued talking to the other occupants.

¶ 6            At the fuel pump immediately next to the Malibu was a black Chevrolet Equinox. Perkins and La'Azia King were seated in the vehicle, with Perkins in the front passenger seat and King in the driver's seat. Defendant approached the front passenger side and can be seen conversing with Perkins, while Palmer remained by the back of the Malibu, watching defendant. After watching defendant converse with Perkins for some time, Palmer made a sudden move towards the Equinox and attempted to open the rear driver's side door, to no avail. Realizing the door was locked, Palmer walked around the back of the Equinox to join defendant at the front passenger window, while defendant continued to talk to Perkins. Shortly thereafter, defendant reached into the Equinox with a handgun and pointed it at Perkins; a struggle for the weapon ensued. As soon as Perkins and defendant began struggling over the handgun, the brake lights on the Jeep illuminated. Palmer also began reaching into the Equinox with another handgun until a flash could be seen, apparently from the muzzle of one of the weapons when it discharged. At that point, defendant and Palmer both ran away from the Equinox and crouched down on the rear side

of the Malibu. When fleeing from the Equinox, defendant can be seen pulling his hand out of the vehicle while still holding a handgun. Palmer pulled his hands out of the Equinox without a gun. After defendant and Palmer fled, Perkins can be seen trying to manipulate a handgun while still seated in the passenger seat. The Jeep in which defendant arrived began to pull out of its parking spot immediately after the initial shot was fired. Once the Jeep started pulling away, defendant ran towards it and jumped in. Palmer initially ran toward the Jeep as well, but then changed direction, ran back towards the Equinox, and fired at least two more shots at Perkins while standing behind the Malibu. Palmer then jumped into the Malibu as it was pulling away from the fuel pump.

¶ 7                             B. Physical Evidence and Defendant's Arrest

¶ 8             Police would later recover a Canik TP9 9-millimeter handgun (Canik) from the front passenger floorboard of the Equinox with a DNA profile that matched Palmer's. Approximately $400 was found in the Equinox and approximately $1100 was found on Perkins. Defendant and Palmer were arrested several hours after the shooting while sitting in a vehicle that belonged to a friend. A Springfield XD subcompact 9-millimeter handgun (Springfield) with an extended magazine was located on the floorboard of the back passenger side seat where defendant was sitting.

¶ 9                             C. Jury Trial

¶ 10             A jury trial ensued in August 2022. The State explained to the jury that defendant and Palmer were at the Shell station on the night of the incident with friends when they learned that Perkins had a large amount of cash and the two decided to rob him. One of them dropped a gun in the car when Perkins fought back; as they were running from the Equinox, defendant handed Palmer his gun and Palmer fired into the vehicle. The attempted armed robbery supported the felony murder charge, as defendant and Palmer were each accountable for the other's conduct.

Defendant's defense during trial was that the confrontation with Perkins was a personal dispute, not an attempted robbery.

¶ 11                                    1. *Terriana Tillman's Testimony*

¶ 12          Terriana Tillman testified that she and a group of friends gathered at her apartment prior to going to the Shell station. Defendant and Palmer were there, along with Demario Palmer, Steven Johnson, Dreyana Dixson, Tylisha Rankins, and Tillman. Demario is the father of Tillman's child, and defendant is the child's godfather. Demario and Palmer are brothers. The group initially drove to the Shell station, a popular hangout spot, in two separate vehicles. Defendant was driving the Jeep, and the rest of the group traveled in the Malibu. The group initially left the station but returned shortly afterwards. Defendant parked the Jeep with the rear bumper facing the building and the front bumper facing the fuel pumps, a position from which cars at the fuel pumps could be observed by the Jeep's occupants. Defendant left the vehicle to purchase items inside the Shell and may have been socializing with other people in the parking lot. Once defendant left the vehicle, Tillman moved to the driver's seat.

¶ 13          Tillman saw Perkins talking to Demario at some point but denied Demario was talking about Perkins when he got back into the Jeep. She would later tell detectives that Perkins "flashed some money" when talking to Demario. She also denied hearing, or paying attention to, any conversation between defendant and Demario. She was not paying attention to what was going on, but she believed defendant left the Jeep; she then heard gunshots. Defendant got back in the Jeep, and they drove back to Tillman's apartment. Police arrived at her apartment and took everyone except defendant and Palmer for interviews.

¶ 14          The prosecutor confronted Tillman with statements she made during her police interview. She did not recall the police asking about what Demario saw and denied that Demario

told her what he saw. She admitted that during the interview, she said that Perkins walked up to Demario and "flashed some money." She did not remember saying that defendant got out of the car and talked to Palmer, and she denied telling police "that's when they must have put it together and came up with what they were going to do and it happened." She also denied stating that it was defendant and Palmer when asked during the interview who came up with the idea to rob Perkins. She denied ever hearing the mention of a robbery. Discussion of a robbery was something she would remember, although it was something she might not want to remember because "it's traumatizing." But, if defendant had talked about robbing someone, she would have remembered that.

¶ 15        2. *La'Azia King's Testimony*

¶ 16        King, who was seated in the driver's seat next to Perkins at the time of the incident, testified that she was pregnant with Perkins's child and also had a child with defendant's cousin. At the time of the incident, she was in a relationship with Perkins, not defendant's cousin. There was a large amount of cash in the vehicle. Defendant, with whom she was familiar from prior interactions, approached the vehicle and asked Perkins where he could obtain cannabis. Perkins pointed him to a vehicle at a different fuel pump, and defendant "went and got it." Defendant approached the vehicle again while she and Perkins were listening to a song; defendant said he knew a better version. Perkins handed defendant a phone so he could play the song, and at that point defendant reached into the vehicle and put a handgun to Perkins's neck. Another individual she did not recognize tried to open the back driver's side door, but it was locked. Once defendant and Perkins began to struggle, the other individual stood next to defendant and held a gun to Perkins's stomach, and the gun fired. One of the guns fell to the floor. She identified Palmer out of photo lineup and informed police of defendant's identity. She was unaware of any issues

between defendant and Perkins. She and Perkins had gone to venues where defendant was performing as a rapper and were not concerned about conflict with defendant. Perkins and defendant had been in each other's presence prior to the shooting without incident. Nothing said during the incident indicated it was a robbery.

¶ 17                            3. *Tylisha Rankins's Testimony*

¶ 18            Tylisha Rankins testified that she was in the Jeep during the incident. Demario and defendant both left the vehicle after they parked facing the fuel pumps. She did not notice them talking to each other when they got back in. She did not recall Demario talking about someone having a large amount of cash. When the shots were fired, defendant was "next to the [Equinox]." Defendant got back into the Jeep and Rankins, Tillman, Demario, and defendant drove back to Tillman's apartment. Palmer, Johnson, and Dixson arrived at Tillman's apartment, but Rankins did not observe defendant and Palmer conversing because she was upstairs "freaking out." She did not see defendant with a firearm and could not recall a conversation at the apartment about a firearm. Palmer and defendant took her car and left the apartment.

¶ 19            The prosecutor asked if she recalled portions of her police interview and the statements she had given. Specifically, the prosecutor asked if she had stated that Demario was talking about someone who had a lot of money or "bands" and that defendant and Demario were "going back and forth on what they were going to do, but I didn't think they were for real." Rankins responded that she probably did say that but could not recall. The prosecutor then asked whether she stated Palmer and defendant said that a gun was left in the Equinox. Rankins could not recall making that statement but said, "If I did, then, yes."

¶ 20            4. *Arguments and Ruling on the State's Request to Admit Recorded Interviews*

¶ 21            Outside the presence of the jury, the State detailed the portions of the police

interviews of Rankins and Tillman it intended to play. Defendant objected, arguing the proper procedure had not been followed where the witnesses had not been declared hostile and the proper foundation had not been laid. The trial court ruled that the witnesses did not need to be declared hostile and that the introduction of the recordings was controlled by well-established law. The court found that the witnesses were evasive in their answers to the State's questions, and even when they did answer questions, those answers were "inconsistent even on the stand in and of themselves." The court allowed the State to play the portions of the recorded interrogations and stated the jury could consider the recordings both as substantive evidence and for impeachment. Defendant asserted a standing objection for a lack of foundation and improper impeachment.

¶ 22                     5. *Content of Police Interviews*

¶ 23        There were three portions of Tillman's interview shown to the jury. In the first, she says that defendant was out of the car, "over there talking to [Palmer]," and "I guess that—that's when they must have put it together, whatever, and came up with what they were going to do and it happened." In the second, a detective asks who "they" means, and Tillman responds, "[Palmer] and [defendant]. It was just [Palmer] and [defendant] that came up with whatever they had going on." In the third, the detective asks Tillman, "you're saying that goes down, [Palmer] and [defendant] make whatever the plan is they're going to make because this dude flashed the money, right?" and Tillman responds with "uh huh" and nods her head.

¶ 24        The State played three clips from Rankins's interview. In the first, she said Demario saw someone pull out a lot of money and "they [(Demario and defendant)] were basically going back and forth about what they were going to do or whatever, but I did not think they were really for real." In the second, she agreed with the detective that it was defendant and Demario talking about the individual with the money and said that they then reversed the car, defendant got out of

the car, Tillman got in the front seat, there was a "commotion," and then it was a "blur." In the third video clip, Rankins says that once they returned to the apartment, defendant and Palmer said that "somebody's gun" was left in the Equinox.

¶ 25                    6. *Facebook Video and Photograph of the Canik*

¶ 26            Also relevant to this appeal, the State introduced into evidence a video of defendant uploaded to Facebook, in which he displayed the Springfield handgun and a photograph of Palmer holding the Canik handgun. The Facebook video is 28 seconds long and shows defendant lying on a couch with his upper body elevated by leaning on his elbow. He is seen smoking an unidentified substance rolled into a cigarette form and mumbling mostly incoherently as he points and waves the Springfield at the camera. He coherently states that, "I'm only uppin' my gun [because] it's like three in the morning, I would hope the Facebook not on the—the police on Facebook right now. Please hope they not." The video was taken less than 24 hours before the shooting.

¶ 27            The photograph shows Palmer holding the Canik in one hand while holding up the other hand with his index and middle finger crossed, his ring finger down, and pinky finger up.

¶ 28            Defendant argued that both the video and the photograph were other crimes evidence pursuant to Illinois Supreme Court Rule 404(b) (eff. Jan. 1, 2011). Thus, the State was required to provide notice, and both exhibits were prejudicial propensity evidence. Further, the State did not need the "picture of [Palmer] giving what appears to be maybe a gang sign." Defendant would stipulate that Palmer possessed the Canik. The State argued that both exhibits were being used to connect defendant and Palmer to the respective handguns. The video was taken less than 24 hours before the offense, and the photo was taken approximately two weeks before.

¶ 29            The trial court allowed the State to present the exhibits, reasoning that there was not going to be any testimony regarding gang affiliation and the exhibits reflected the "*res gestae*"

of the State's case. The court agreed the exhibits were not propensity evidence but served to link the individuals to the handguns.

¶ 30                            7. *Defendant's Testimony*

¶ 31           Defendant testified that he went out with his friends on the evening in question with the intention of going bowling. He grew up in Peoria, Illinois, but moved to Atlanta, Georgia, after graduating high school. At the time of the incident, he was visiting Peoria. Prior to going to the bowling alley, they went to the Shell station. Although he was aware of the relationship between King and Perkins before that evening, he was upset when he saw the two together because it appeared King was cheating on defendant's cousin, with whom King had a child. Demario and defendant discussed what, if anything, should be done, but they never discussed robbing anyone. He was attempting to forget about the issue, but it was still on his mind. Despite the issue with Perkins, defendant still wanted to obtain some cannabis because the other cannabis the group had was "bogus." Defendant asked Perkins where to obtain some more cannabis. Defendant proceeded to purchase cannabis from a vehicle pointed out by Perkins. He went to the Malibu where Palmer was, and the occupants were smoking cannabis.

¶ 32           Defendant and Palmer also discussed King and Perkins being at the Shell station together, and defendant stated he was thinking about confronting Perkins with a gun to scare him while telling him to stop threatening defendant's cousin. Palmer told defendant that he "had his back" and would be watching him. When Palmer joined defendant at the window of the Equinox, defendant grabbed Perkins while he "brandished" the gun, putting the weapon inside the vehicle. In that moment he was unable to speak, Perkins knocked the Canik handgun out of his hand, and it was left inside of the Equinox. Defendant blacked out after that and could only remember hearing gunshots and running back to the Jeep before returning to Tillman's apartment. Defendant

reiterated that he never discussed robbing Perkins and he was referring to Perkins as the person with all the money, or "bands," because Demario did not know Perkins, and that is how Demario described him. Defendant claimed that the Canik was his gun.

¶ 33　　　　Defendant denied that he grabbed the Springfield handgun when leaving Tillman's apartment and brought it to the Shell station. Further, he did not know how it ended up by his feet when police found him in his friend's vehicle after the shooting. He admitted that he was holding the Springfield in the Facebook video taken before the shooting, but he said it was not his and "anybody gets access to that gun."

¶ 34　　　　　　　　　　8. *Jury Verdict and Sentence*

¶ 35　　　　Following deliberations, the jury found defendant guilty on all counts. Defendant filed a motion for a new trial, arguing, among other things, that the trial court erred in (1) allowing the State to ask leading questions of its witnesses who had not been declared hostile, (2) admitting the police interview recordings as substantive evidence, and (3) admitting the Facebook video of defendant and still photograph of Palmer, as they constituted propensity evidence submitted by the State without notice. The court denied the motion and sentenced defendant to concurrent sentences of 38 years and 3 years for felony murder and aggravated unlawful use of a weapon, respectively.

¶ 36　　　　This appeal followed.

¶ 37　　　　　　　　　　II. ANALYSIS

¶ 38　　　　Defendant argues on appeal that the trial court erred by (1) admitting the prior inconsistent statements of Tillman as either substantive evidence or for impeachment and (2) allowing video and photographic evidence to be shown to the jury where the danger of unfair prejudice substantially outweighed the probative value.

¶ 39　　　　　　　　　A. Prior Inconsistent Statements

- 10 -

¶ 40        Initially, defendant concedes that he forfeited his argument on appeal challenging the admission of the inconsistent statements by failing to raise it at trial but contends that we can review his claim as first-prong plain error. See *People v. Mudd*, 2022 IL 126830, ¶ 21 ("It has long been Illinois law that an issue not accompanied by a contemporaneous trial objection and raised in a posttrial motion is forfeited. In the absence of the requisite objections, forfeited issues are reviewable on appeal in a criminal case only under the doctrine of plain error.").

¶ 41        Plain error may be demonstrated in one of two ways. In this matter, defendant requests review under the first prong of the plain-error doctrine. To establish first-prong plain error, a defendant must show " 'that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice.' " *People v. Moon*, 2022 IL 125959, ¶ 23 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 51). We review claims of plain error *de novo*. *Mudd*, 2022 IL 126830, ¶ 22. In undertaking such review, we first consider whether an error occurred. *People v. Galarza*, 2023 IL 127678, ¶ 45.

¶ 42        Generally, an out-of-court statement offered for the truth of the matter asserted, also known as hearsay, is inadmissible at trial. *People v. McCarter*, 385 Ill. App. 3d 919, 929-30 (2008). Exceptions to this general rule allow prior inconsistent statements to be used as both impeachment and substantive evidence, given certain requirements are met. *People v. Morganson*, 311 Ill. App. 3d 1005, 1010 (2000); *McCarter*, 385 Ill. App. 3d at 930. At trial, the State sought to introduce the statements as substantive evidence. Regarding the requirements needed to introduce the statements as substantive evidence, section 115-10.1(c)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1(c)(2) (West 2022)) provides in relevant part:

> "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

* * *

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

***

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar means of sound recording."

¶ 43 Defendant contends that Tillman lacked personal knowledge of the events at issue. "Personal knowledge," as contemplated in the statutory exception to hearsay, requires that the witness actually perceived the events that are the subject of the statement or admission and not merely heard about it afterwards. *People v. Simpson*, 2015 IL 116512, ¶ 32. The reasoning behind this requirement is that if the witness is simply repeating a third-party statement absent personal knowledge, cross-examination of that witness would fail to give the jury insight into the statement's reliability. *McCarter*, 385 Ill. App. 3d at 931.

¶ 44 Defendant argues that Tillman was only "guessing" what defendant and Palmer were discussing while she observed them talking on the other side of the Shell station. Tillman stated in two different portions of the recorded interview that defendant was "over there talking to [Palmer]," and, "I guess that—that's when they must have put it together, whatever, and came up

- 12 -

with what they were going to do and it happened." In the third portion, Tillman responded in the affirmative to the detective's question that whatever plan of action defendant and Palmer devised was "because this dude flashed the money, right?"

¶ 45    The State contends these portions of Tillman's statement to detectives did not introduce the content of any conversation. Rather, Tillman's statement reflected her conclusions from witnessing the events. Placing these statements in the context of the surveillance video, Tillman had a literal front row seat to the events as they unfolded, from defendant consulting with Palmer to watching defendant and Palmer act in a preplanned manner, where defendant distracted the occupants of the Equinox while Palmer attempted to open the rear driver side door of the vehicle. It is apparent that Tillman was observing the events, as once the struggle over the weapons began, the brake lights of the Jeep illuminated. Once a shot was fired inside the Equinox, the Jeep began to pull away.

¶ 46    Tillman acknowledged during trial that Demario and defendant were talking about how Perkins had a large amount of cash on his person while inside the Jeep. Looking at the recordings admitted from Rankins's interview, the jury was made aware that defendant and Demario were discussing Perkins, the cash he possessed, and what they were "going to do about it." Tillman was sitting right next to Rankins, and despite Tillman's denial of what she heard after the fact, it appears from her statements that she had personal knowledge of the plan to rob Perkins—albeit not from the conversation with Palmer—and witnessed the plan unfold. See *People v. Fauber*, 266 Ill. App. 3d 381, 390 (1994) (stating whether a witness had personal knowledge of events is determined from face of the statement, not later testimony of the recanting witness).

¶ 47    Nonetheless, a review of the record results in the conclusion that the portions of

Tillman's interview shown to the jury contained nothing more than her surmise as to what Palmer and defendant were discussing while standing by the Malibu. It might be easy for Tillman to infer that defendant and Palmer were discussing a plan to rob Perkins, but it might be just as easy for any of us—including the jury—to draw the same inferences. That is precisely the point; witness statements from personal knowledge may give rise to other inferences, but it is for the jury, not the witness, to draw those inferences. Regardless, inferences are explicitly insufficient under section 115-10.1(c)(2); the statute requires personal knowledge in order for the statement to be admitted as substantive evidence. While Tillman viewed Palmer and defendant speak by the back of the Malibu following a conversation between defendant and Demario regarding cash and a plan of action, there is nothing indicating she was privy to the contents of the conversation that took place on the other side of the Shell station. Her "guess" as to what defendant and Palmer were discussing and response to the question from detectives was nothing more than speculation. Thus, it was error for the trial court to admit the recordings from Tillman's interview as substantive evidence.

¶ 48       Having found error, we must continue with our plain-error analysis under the first prong and assess whether the evidence was closely balanced. "To determine whether the evidence was, in fact, closely balanced, a reviewing court must review the entire record and conduct a 'qualitative, commonsense assessment' of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *People v. Williams*, 2022 IL 126918, ¶ 58 (quoting *Sebby*, 2017 IL 119445, ¶ 53).

¶ 49       On appeal, defendant only claims that the evidence relating to his attempted armed robbery conviction was closely balanced and thus necessitates reversal. A person commits the offense of attempted armed robbery when, with intent to commit an armed robbery, they perform

any act that constitutes a substantial step toward the commission of armed robbery. See 720 ILCS 5/8-4 (West 2020). A person commits armed robbery when they knowingly take property from another or while in the presence of another by the use of force or by threatening the imminent use of force while carrying about their person or otherwise armed with a firearm. *Id.* §§ 18-1, 18-2. The only element at issue in this appeal is whether defendant had the requisite intent when confronting Perkins. A defendant's intent may be, and often is, proved through circumstantial evidence and the reasonable inferences arising therefrom. *People v. Acklin*, 2020 IL App (4th) 180588, ¶ 21 (citing *People v. Snow*, 124 Ill. App. 3d 955, 961 (1984) ("As evidence of intent is usually not direct, it may be proved circumstantially by inferences reasonably drawn from the circumstances of defendant's conduct."), *People v. Hopkins*, 229 Ill. App. 3d 665, 672 (1992) ("The State can prove a defendant's intent by inferences drawn from his conduct and from surrounding circumstances.")).

¶ 50 Following a review of the record, the evidence in this case regarding the attempted armed robbery charge was not closely balanced. Although circumstantial, the evidence in this case of defendant's intent was compelling. See *People v. Williams*, 2022 IL App (2d) 200455, ¶ 119 (collecting cases finding that a conviction based on circumstantial evidence is not inherently closely balanced). Further, defendant's version of events did not appear plausible, and his testimony was filled with inconsistencies.

¶ 51 The surveillance video from the Shell station speaks volumes and shows a coordinated effort to gain entry to the Equinox while defendant distracted the occupants. Prior to this coordinated effort, Rankins stated that defendant and Demario were talking about Perkins having a large amount of cash and what "they were going to do about it." Tillman also testified that she heard discussions about Perkins having a significant amount of money on his person.

- 15 -

Defendant attempts to challenge Tillman's testimony, stating she had no personal knowledge of this discussion and disputes whether Tillman saw Perkins display a large amount of cash. However, unlike the other evidence, this statement was introduced by Tillman's live testimony, not a recorded statement. At worst, Tillman's statement constituted hearsay, but an objection on that basis was not made (and no potential exceptions to hearsay were explored). See *People v. Avery*, 321 Ill. App. 3d 414, 418 (2001) (" '[T]estimony based on hearsay that is not objected to at trial should be given appropriate consideration.' " (quoting *People v. Becerril*, 307 Ill. App. 3d 518, 526 (1999))).

¶ 52        Defendant testified that he only wanted to "scare" Perkins by brandishing his gun and that Palmer was only there for "backup." Instead of robbery, the driving factor behind his desire to confront Perkins was that he thought King was cheating on his cousin with Perkins. However, the testimony that Palmer was only there for "backup" is contradicted by his actions in the surveillance footage. Moreover, on two separate occasions, defendant had the opportunity to confront Perkins about his relationship with King but instead asked Perkins where to purchase cannabis and then discussed music as a distraction. Defendant also acknowledged he had been aware of Perkins and King being in a relationship prior to this incident, and King testified she and Perkins had gone to defendant's rap performances in the past and had no concerns about a confrontation. Defendant himself admitted that he had been around Perkins and King previously while they were in a romantic relationship without incident. Defendant also gave conflicting testimony by stating he was upset that he thought King was cheating on his cousin but then also downplayed whether he was angry about the situation at all. Further undermining his credibility was the testimony that he dropped his handgun (the Canik) in the Equinox, which is plainly refuted by watching the surveillance footage. In his posttrial motion for a new trial, defendant argued that

the State had failed to carry its burden. Although the trial judge was not the trier of fact, he opined that, "To say that [defendant's testimony] was unbelievable would be an understatement."

¶ 53    In sum, the circumstantial evidence of defendant's intent to rob Perkins was compelling, and defendant's version of events was implausible. Despite defendant's assertion to the contrary, the evidence that he was attempting to rob Perkins was not closely balanced. Accordingly, we must honor defendant's procedural forfeiture.

¶ 54        B. Admission of Facebook Video and Photograph into Evidence

¶ 55    Next, defendant challenges the admission of a Facebook video where he displays the Springfield, and a photograph of Palmer holding the Canik. He argues that this evidence should have been excluded pursuant to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) because its probative value was substantially outweighed by the risk of unfair prejudice. He also argues the evidence had the potential to be viewed as other-crimes evidence by the jury and should have been found inadmissible pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011).

¶ 56    Initially, we are unpersuaded by defendant's argument that the Facebook video and photograph of Palmer constitute other-crimes evidence. "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). "Other-crimes evidence is admissible to prove any material fact other than propensity that is relevant to the case." *Id.* Indeed, "[e]vidence concerning the facts and circumstances of the crime the defendant is accused of committing is not other-crimes evidence." *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 44.

¶ 57    Defendant was charged with felony murder, attempted armed robbery, and aggravated unlawful use of a weapon. Forensic testing was unable to determine which gun fired

the shot that killed Perkins because the projectile was deformed beyond identification. The State proceeded on an accountability theory, where, regardless of who fired the shot that killed Perkins, defendant could be found culpable. In order to prove its case, the State was required to connect defendant and Palmer to the handguns. In his briefing, defendant acknowledges the relevance of this evidence to link him and Palmer to the weapons used. In the trial court, the State argued that this evidence was not propensity evidence and was for linkage, and the court's ruling was that the evidence was relevant to link both defendant and Palmer to the weapons prior to the murder of Perkins. In light of the fact that the evidence was relevant to prove an element of the State's case and was not simply to show propensity, it was not other-crimes evidence. This, however, does not end our analysis, as defendant argues that the evidence was still unfairly prejudicial to a substantial degree.

¶ 58　　　　　Evidence is generally admissible if it is relevant and inadmissible if it is irrelevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is considered relevant. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Nonetheless, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). All evidence offered by the State at a criminal trial is prejudicial in that its purpose is to prove the defendant committed the charged offense or undermine the defense theory of the case. *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 120. The unfair prejudice of evidence begins to substantially outweigh the probative value when it has " ' "an undue tendency to suggest [a] decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." ' " *People v. Martin*, 2017 IL App (4th) 150021, ¶ 19 (quoting *People v. Eyler*, 133 Ill. 2d 173, 218 (1989) (quoting

Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984)). We evaluate a trial court's evidentiary rulings for an abuse of discretion. *People v. Heineman*, 2023 IL 127854, ¶ 59.

¶ 59                                   1. *Facebook Video*

¶ 60        Regarding the Facebook video of defendant, he concedes that it was relevant, but he argues that any probative value was significantly outweighed by prejudice to him. He contends that the prejudice resulting from the impression that he is under the influence of a substance, is smoking what appears to be cannabis, that he points the Springfield "menacingly" at the camera, and mentions that he hopes the police are not watching makes the evidence inadmissible in the form introduced by the State. Defendant also argues a still photo from the video would have been sufficient and admitting the video was error. We disagree.

¶ 61        During his testimony, defendant denied the Springfield was his and stated that anyone had access to the gun. In the video, while displaying the Springfield, defendant claims that he is "uppin' his gun." Defendant argues that this statement does not equate to an admission of ownership, asserting that this only amounts to a "mumbled brag." We disagree. His statement in the video is clearly a claim to the gun and puts it in his possession less than 24 hours before the murder of Perkins. The demonstration of control of the gun in the video was probative evidence linking defendant to the Springfield and weighed against requiring the State to submit only a still photograph from the video. See *People v. Bounds*, 171 Ill. 2d 1, 46 (1995) ( "[T]he prosecution is not disabled at trial from proving every element of the charged offense and every relevant fact, even though the defendant fails to contest an issue or is willing to stipulate to a fact.").

¶ 62        Further, there was testimony about the use and purchase of cannabis by defendant from multiple individuals during the trial. Defendant himself admitted he had asked Perkins where

to purchase cannabis and that he used cannabis. While defendant argues pointing the gun at the camera and mentioning law enforcement during the video should have precluded the video from reaching the jury, this evidence is no more prejudicial than the surveillance video from the Shell station and serves the extremely probative purpose of linking him to the Springfield less than 24 hours before the commission of these offenses. The State was required to establish every aspect of its case, and connecting defendant to the gun was integral in doing so. The probative value of the video was high and the chance for undue prejudice that substantially outweighed the probative value was low.

¶ 63                                    2. *Photograph of Palmer*

¶ 64            Regarding the photograph of Palmer, defendant argues that Palmer is flashing what he claims to be a gang sign. Such a designation as to Palmer would also attach to defendant through criminal association. Defendant also asserts that his willingness to stipulate to another photo where the Canik was displayed in Palmer's hand diminished the probative value of this photograph.

¶ 65            At no point during trial was gang association discussed, nor was it ever suggested that the hand gesture in the photo was a gang sign. The hand gesture in the photograph was made by Palmer, not defendant, so any connection to defendant is highly attenuated. There was no evidence provided in the trial court or on appeal that the gesture is gang related. As the court correctly found, the gesture was ambiguous without supporting testimony, and there was no evidence it was a gang sign.

¶ 66            In both instances, the video and photograph, defendant attempts to narrow the issue before the jury as one of only his intent and argues that suggested stipulations to the evidence should have been accepted. Defendant cites *People v. Walker*, 211 Ill. 2d 317 (2004), to support his argument that the failure to adopt his suggested stipulations was error.

¶ 67          In *Walker*, our supreme court adopted the reasoning in *Old Chief v. United States*, 519 U.S. 172 (1997), after examining the issue of admitting other-crimes evidence to merely prove a defendant's prior conviction and felon status. The issue in those situations was that a jury might decide a defendant is of bad character if he committed a prior felony and, therefore, is more likely to have committed the current offense. *Walker*, 211 Ill. 2d at 331. Following the decisions in *Old Chief* and *Walker*, if defense counsel offers to stipulate to a defendant's prior conviction, the trial court is obligated to accept the stipulation. *People v. Moore*, 2020 IL 124538, ¶ 40. Given that we are not faced with a situation where a stipulation to prove defendant's prior conviction and felon status was refused, *Walker* is inapplicable to the case at bar and defendant's reliance on it is misplaced. The contested evidence was used for the proper purpose of linking the two individuals to the weapons used in the offense; the State was not required to introduce this evidence via stipulation. See *Bounds*, 171 Ill. 2d at 46. The probative value of linking Palmer to the gun outweighed the possibility of unfair prejudice.

¶ 68                              3. *Harmless Error*

¶ 69          Before concluding, we also find that even if there was an error in admitting either of the two exhibits discussed above into evidence, we agree with the State that it was a harmless error in light of the evidence presented at trial.

¶ 70          Only if the trial court's error prejudiced the defendant is a reviewing court required to grant relief; harmless errors do not require reversal. *People v. Gavin*, 2022 IL App (4th) 200314, ¶ 75. "An evidentiary error is harmless where there is no reasonable probability the jury would have acquitted the defendant absent the error." *Id.* (citing *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104). After reviewing the entirety of the evidence in this matter, we find no reasonable probability that the jury would have acquitted defendant even absent the complained-of evidence.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.